**HERBERT CONSTRUCTION COMPA-NY, Plaintiff–Appellee, Cross–Appellant,**

v.

**CONTINENTAL INSURANCE COMPA-NY, Defendant–Appellant, Cross–Appellee.**

No. 715, Docket 90–7697.

United States Court of Appeals, Second Circuit.

Argued Dec. 19, 1990.

Decided April 19, 1991.

Lewis Stockman, New York City (Hart & Hume, New York City, of counsel), for defendant-appellant, cross-appellee.

Frederick Cohen, New York City (John S. Wojak, Jr., Ross & Cohen, New York City, of counsel), for plaintiff-appellee, cross-appellant.

Before MESKILL, PRATT and WALKER, Circuit Judges.

MESKILL, Circuit Judge:

The Continental Insurance Company (Continental) appeals from a judgment of the United States District Court for the Southern District of New York, Carter, *J.*, finding Continental liable to Herbert Construction Company (Herbert) in the amount of $680,000. Judgment was entered pursuant to (1) an order of the district court granting partial summary judgment in favor of Herbert on the question of liability and denying Continental's cross-motion for summary judgment seeking dismissal of the complaint, and (2) a subsequent stipulation to damages. Continental challenges the district court's decision to grant summary judgment for Herbert, arguing that the court misapplied the law of apparent authority. Continental also contends that the district court should have granted summary judgment in its favor.

We accept Continental's first contention and reject its second. Consequently, we affirm in part, vacate in part, and remand the case to the district court for further proceedings.

## BACKGROUND

In 1987, Herbert entered into an agreement with Shearson Lehman Brothers, Inc. to construct a thirty-nine story office tower at 388–390 Greenwich Street, New York, New York (Shearson building). As general contractor for the project, Herbert negotiated an agreement with Michaels Art Metals (Michaels), dated October 10, 1987, to install the windows on the Shearson building. Herbert required Michaels to furnish payment and performance surety bonds before the subcontract would be awarded.

Several months later Michaels mailed to Herbert payment and performance bonds dated March 9, 1988. The performance bond at issue was executed on a bond form bearing the logo "The Continental Insurance Companies," and designated Continental, one of fifteen members of The Continental Insurance Companies Group, as the surety on the bond. The bond contained

the signature of Lawrence P. Dixon as attorney for Continental. The bond listed Michaels as the principal and Herbert as the obligee. The performance bond accompanied a payment bond, a Continental financial statement dated December 31, 1985, and a general power of attorney describing Dixon as Continental's "true and lawful attorney." A corporate seal appeared on the documents; Continental, however, denies that the seal was its own.

Having complied with Herbert's request to obtain the requisite bonds, Michaels was awarded the subcontract, which was signed on April 15, 1988. Problems arose soon after Michaels began work on the Shearson building. On June 20, 1988, Michaels filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code. Michaels then informed Herbert that it probably would not be able to complete performance under the subcontract. Herbert subsequently wrote a letter to Continental, dated June 30, 1988, informing Continental that it would have to remedy any default by Michaels on its subcontract obligations. The subcontract between Herbert and Michaels was formally terminated by letter dated July 20, 1988. Herbert sent a copy of that letter to Continental, advising Continental of Herbert's intention to seek recovery under the performance bond.

At about this time, the machinations of Dixon, the executing agent on the performance bond, came to light. Unbeknownst to Herbert and apparently Michaels as well, Dixon did not have authority in March 1988 to execute the performance bond on behalf of Continental. Continental had revoked Dixon's power of attorney to execute surety bonds on behalf of Continental in October 1987, several months earlier.

The history of Dixon's agency relationship with Continental dated back at least to 1980. In 1980 Dixon began soliciting applications for surety bonds and insurance on behalf of Continental through Dixon Brokerage, Inc., an independent insurance agency owned by Dixon. To facilitate Dixon's execution of Continental bonds, Continental gave Dixon a general power of attorney in 1980. In connection with this arrangement, Continental ultimately delivered to Dixon twenty-five undated and unnumbered facsimile power of attorney forms, Continental corporate seals and several original blank bond forms bearing the logo "The Continental Insurance Companies." Dixon retained this general power of attorney for Continental until the fall of 1987.

In late September 1987, Dixon submitted a bid bond for a construction project in an amount exceeding what he had advised Continental would be bid for the job. Because of this incident, Continental decided to revoke Dixon's power of attorney to execute bonds, but to leave intact his authority to solicit applications for surety bonds and insurance for execution by Continental. Continental notified Dixon by phone of its decision on October 12, 1987. On October 19, 1987, Justin Larkman, a bond manager for Continental, and Chris Terzian, a Continental underwriter, went to the office of Dixon Brokerage. There they met one of Dixon's associates, who showed them where Dixon kept his power of attorney forms and corporate seals, whereupon they retrieved the power of attorney forms, two corporate seals and some Continental financial statements. Continental concedes that it made no efforts to inform individual clients or the public at large that Dixon's authority to execute Continental bonds had been revoked. Continental also concedes that Larkman and Terzian did not retrieve the Continental blank bond forms that had been given to Dixon, perhaps because Dixon was still allowed to solicit bond and insurance business for Continental. In fact, after October 1987, Dixon sold Michaels a Continental "Catastrophe Liability Policy," to be effective from December 19, 1987 to December 19, 1988. Dixon's authority to solicit surety and insurance applications on behalf of Continental was not terminated until June 28, 1988.

In early June 1988, Continental learned that it was the surety on a bond, other than the one at issue here, that it had no record of issuing. Upon determining that the mysterious bond had been executed by Dixon after his power of attorney had been revoked, Continental contacted Dixon who

agreed to attend a meeting with Continental representatives on June 13, 1988.

Attending the June 13 meeting were Dixon, Matthew Klimczak, assistant vice president of Continental's surety bond department, a Continental attorney, and two members of Continental's corporate security department. An account of the meeting is contained in the affidavit of Klimczak, Dixon having thereafter invoked his Fifth Amendment privilege against self-incrimination. Dixon admitted during the meeting that he issued several unauthorized bonds after Continental revoked his power of attorney in October 1987. According to Dixon, he was motivated by a desire to maintain relationships with his clients and to "get even" with Continental for having revoked his power of attorney. Dixon also admitted that he deposited the premiums for the unauthorized bonds in his brokerage account, forwarding nothing to Continental.

Dixon feigned authority to execute the bond in question by doctoring a valid power of attorney form signed earlier, before the revocation by Continental. The power of attorney was returned to Dixon by a customer whose bid had been rejected. Dixon deleted the date on the power of attorney form, made several photocopies of it and then affixed an executed copy to the unauthorized performance bond. Dixon claimed he stamped the bond with another insurance company's corporate seal.

By letter dated June 23, 1988, Continental notified all the obligees on the fraudulently executed bonds that the bonds were unauthorized. A second letter followed, dated June 30, 1988, setting forth the method by which Dixon fraudulently issued the bonds and reiterating the invalidity of the bonds. Herbert received both letters.

Faced with Michaels' bankruptcy and Continental's disavowal of the performance bond, Herbert made arrangements to complete Michaels' work on the Shearson building. The extra work cost Herbert approximately $790,000 more than the price specified in the subcontract with Michaels. On November 15, 1988, Herbert filed a complaint in the United States District Court for the Southern District of New York seeking damages from Continental for failing to meet its obligations under the performance bond. Herbert requested a jury trial. After both parties engaged in substantial discovery, Herbert moved for summary judgment on the issue of liability. Herbert asserted that the alleged termination of Dixon's general power of attorney was ineffective as a matter of law because Dixon possessed the apparent authority to bind Continental. Continental cross-moved for summary judgment dismissing the complaint claiming that apparent authority was non-existent because Continental retrieved its power of attorney and corporate seals from Dixon, Herbert did not deal directly with Dixon, and Herbert had a duty of inquiry regarding Dixon's authority to execute bonds for Continental.

The district court issued an unreported opinion dated April 10, 1990, granting Herbert's motion and denying Continental's cross-motion. The court saw no dispute as to any material facts in the case and applied the law as follows. The court held that the law of apparent authority did not require a direct communication here between the purported agent Dixon and third party, Herbert. It held that the bond documents themselves provided ample evidence of a communication. The court concluded that Continental was responsible for Dixon's possession of a power of attorney form and a blank bond form, which represented sufficient indicia of authority to bind Continental under the law of apparent authority. On this issue the court gave little weight to Continental's attempt to retrieve the power of attorney forms from Dixon. The court also held that Herbert had no actual or constructive notice that the bonds were unauthorized. Finally, the court held that Herbert had no duty of inquiry to determine the extent of Dixon's authority.

The parties stipulated to damages in the amount of $680,000 and a final judgment was entered. Continental appealed.

## DISCUSSION

As is too often the case, this appeal requires us to consider which of two professedly innocent parties, Herbert or Continental, should bear the loss for the dissembling acts of a third party, Dixon. In this instance, our task of assigning loss is constrained by the posture of the appeal, arising as it does after the grant of a summary judgment motion. We therefore must address the often repeated question mandated by Rule 56(c): Do the affidavits and moving papers submitted by the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[?]" Fed.R.Civ.P. 56(c). Several well established rules, a few of which bear repeating here, guide this inquiry. We review *de novo* district court decisions concerning summary judgment, *Burtnieks v. City of New York*, 716 F.2d 982, 985 (2d Cir.1983), and view the evidence in the light most favorable to the party opposing the motion. *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 45 (2d Cir.1988). In addition, "summary judgment will not lie if the dispute about a material fact is '*genuine*,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis added). Finally, and of special import to this case, "the substantive law will identify which facts are *material*" in a given case. *Id.* (emphasis added).

### A. New York Law of Apparent Authority

The New York Court of Appeals has summarized the law of apparent authority in the following manner:

> Upon failure to properly determine the scope of authority, and in the face of damages resulting from an agent's misrepresentations, "apparent authority" is not automatically available to the injured third party to bind the principal. Rather, the existence of "apparent authority" depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal—not the agent.

*Ford v. Unity Hospital*, 32 N.Y.2d 464, 472–73, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 664 (1973) (citations omitted). *See also Fennell v. TLB Kent Co.*, 865 F.2d 498, 503 (2d Cir.1989) (apparent authority requires " 'words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction' " (quoting *Hallock v. State*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178, 1181 (1984))).

From this authority we glean several propositions of New York law critical to the resolution of this appeal. Two scenarios establish the bookends of New York law on apparent authority. At one end sits the agent who possesses actual authority to bind the principal to third parties, a situation not present here given Continental's revocation of Dixon's power of attorney five months before the bond in question was issued. At the other end sits the agent who has no actual authority and perpetrates a fraud on a third party independent of any responsibility of the principal. Such a situation would exist, for instance, if the agent stole a principal's indicia of authority and falsely represented to a third party that he had authority to bind the principal. Under this scenario, the principal would not be liable to the third party, because the apparent authority would not be "traceable" to him. *Ford*, 32 N.Y.2d at 473, 346 N.Y.S.2d at 244, 299 N.E.2d at 664 (citation omitted); *H. Michaelyan, Inc. v. N.J. Guaranty & Plate Glass Ins. Co.*, 144 Misc. 298, 301, 258 N.Y.S. 594, 596 (Sup.Ct.1930) ("The principal, accordingly, is liable only for such acts of his agent as he has ostensibly authorized—not for all their possible counterfeits."), *aff'd*, 234 A.D. 855, 254 N.Y.S. 1004 (1st Dep't 1931).

Apparent authority lies between these two extremes. To recover on this theory the third party must establish two facts: (1) the principal "was responsible for the appearance of authority in the agent to

conduct the transaction in question," *Ford,* 32 N.Y.2d at 473, 346 N.Y.S.2d at 244, 299 N.E.2d at 664 (citation omitted), and (2) the third party reasonably relied on the representations of the agent, *Hallock,* 64 N.Y.2d at 231, 485 N.Y.S.2d at 513, 474 N.E.2d at 1181. "The existence of apparent authority is a question of fact." *Stanford v. Kuwait Airways Corp.,* 648 F.Supp. 1158, 1162 (S.D.N.Y.1986); *but see Karavos Compania Naviera S.A. v. Atlantica Export Corp.,* 588 F.2d 1, 8 n. 15 (2d Cir.1978) (treating apparent authority as a mixed question of law and fact in the context of a finding by the court pursuant to Fed.R. Civ.P. 52(a)).

### B. Herbert's Motion for Summary Judgment

Having said that, we progress to the first question raised on appeal: Should the district court have granted summary judgment in favor of Herbert? We agree with Continental that it should not have done so.

#### 1. *Responsibility for Dixon's Possession of Indicia of Authority*

■ We do not concur with the district court's conclusion that Continental was responsible as a matter of law for Dixon's possession of a Continental power of attorney. The district court found it "of no moment that Continental attempted, albeit unsuccessfully, to retrieve the Power of Attorney statement from Dixon," citing section 130 of the Restatement of Agency to support its analysis. We disagree.

Continental's affidavits, which we must credit in reviewing summary judgment against it, establish that Continental retrieved all powers of attorney Dixon had in his possession on October 19, 1987. Their affidavits also suggest how Dixon managed to present a power of attorney form to Michaels after his authority had been revoked. Dixon transmuted an earlier executed power of attorney into an ostensibly valid one by doctoring a power of attorney form which was returned to him after the bid bond to which it was attached had been rejected.

We do not read the Restatement to render a principal liable as a matter of law under circumstances such as these. The district court relied on the following comment to section 130 of the Restatement of Agency: "Although the principal is entitled to have indic[i]a of authority returned to him upon termination of the relation, if he is unsuccessful in accomplishing this the risk of the deception of third persons who have otherwise no notice of the termination rests upon the principal." Restatement (Second) of Agency § 130 comment (a) (1958). The quoted text indicates that risk should be apportioned to the principal only when "he is unsuccessful in accomplishing this." The "this" to which the Restatement refers, we believe, concerns the principal's efforts "to have indic[i]a of authority returned to him upon termination of the relation." Continental's affidavits, when viewed in its favor, show that Continental indeed retrieved all of the powers of attorney then possessed by Dixon "*upon* termination of the relation" (emphasis added). The subsequent reacquisition by Dixon of a once valid and previously executed power of attorney injects into the case a different factor from that dealt with by the Restatement.

It may be, as Herbert contends, that Continental bears some responsibility for Dixon's reacquisition of a Continental power of attorney. Continental, for instance, could have used original, not facsimile powers of attorney. It also could have numbered and dated each form. Each of these precautions would have helped Continental account for the powers that had been given to Dixon. Failure to adopt these or other precautionary measures in this instance, however, does not make Continental responsible as a matter of law for Dixon's possession of the principal indicia of authority, the power of attorney. In our view, whether Continental bears any responsibility for not tracking down the reacquired power of attorney form and preventing the subsequent doctoring of that form presents a substantial question of material fact, one best left to the collective judgment of a jury.

■ Given the above analysis, and Continental's assertion that Dixon did not use a Continental corporate seal, we must consider whether Herbert is entitled to summary judgment solely because Continental allowed Dixon to retain original blank bond forms. Continental concedes it did not even attempt to retrieve the bond forms after revoking Dixon's power of attorney. That Continental allowed Dixon to retain these forms certainly facilitated the ensuing fraud. But, absent a power of attorney or a corporate seal, Dixon's possession of a blank bond form could not have amounted—alone and as a matter of law—to a manifestation by Continental to third parties that it consented to have Dixon act on its behalf. *See Perry v. New York Life Ins. Co.*, 22 N.Y.S.2d 696, 698 (Sup.Ct.1940) (finding mere possession of application forms insufficient in itself to create an appearance of authority). While blank bond forms may contribute to the impression that a transaction occurred in the ordinary course of business, they cannot, when completed, alone bind the agent's principal to a third party. Therefore, since a question of fact exists as to Continental's responsibility for Dixon's possession of a power of attorney, Herbert was not entitled to summary judgment even though Continental allowed Dixon to retain original blank bond forms.

### 2. *Duty of Inquiry*

■ Continental maintains that several New York cases suggest that one who invokes the doctrine of apparent authority necessarily has a duty to determine the scope of the agent's authority. However, this argument confuses the doctrines of apparent authority and actual authority. In *Ford*, one of the cases Continental cites, the New York Court of Appeals held: "One who deals with an agent does so at his peril, and must make the necessary effort to discover the *actual* scope of authority." *Ford*, 32 N.Y.2d at 472, 346 N.Y.S.2d at 244, 299 N.E.2d at 664 (emphasis added) (citing *Sponge Rubber Prods. Co. v. Purofied Down Prods. Corp.*, 281 A.D. 380, 119 N.Y.S.2d 783 (1st Dep't 1953), *aff'd*, 306 N.Y. 776, 118 N.E.2d 479 (1954)). As the

quoted language indicates, this proposition refers to the doctrine of actual, not apparent, authority. In fact, the case *Ford* cited, *Sponge Rubber*, only dealt with the question of actual authority. This interpretation of *Ford* is also supported by the language directly following the above quotation: "Upon failure to properly determine the scope of authority," you then consider the "existence of 'apparent authority.'" *Ford*, 32 N.Y.2d at 472–73, 346 N.Y.S.2d at 244, 299 N.E.2d at 664.

The same can be said of the other cases cited by Continental. They also do not impose a duty of inquiry as a prerequisite to asserting a cause of action under apparent authority. In *Collision Plan Unlimited, Inc. v. Bankers Trust Co.*, 63 N.Y.2d 827, 830, 482 N.Y.S.2d 252, 253, 472 N.E.2d 28, 29 (1984), the New York Court of Appeals indeed stated in a memorandum opinion: "By invoking the doctrine of apparent authority to justify the propriety of its actions, the bank concomitantly assumed a duty of reasonable inquiry as to [the agent's] actual perimeter of authority." The court, however, went on to say: "The mortgage arrangement should have *triggered* the duty of reasonable inquiry since a gratuitous guarantee by a corporation of a debt of an unrelated corporation is extraordinary." *Collision Plan*, 63 N.Y.2d at 831, 482 N.Y.S.2d at 253, 472 N.E.2d at 29 (emphasis added). In *Strip Clean Floor Refinishing v. New York Dist. Council No. 9*, 333 F.Supp. 385, 396 (E.D. N.Y.1971), the court stated that "one dealing with another known by him to be an agent is bound to inquire as to the extent of the latter's authority." To support this proposition, however, the district court cited *Sponge Rubber*, a New York case, we repeat, concerning the doctrine of actual authority. In addition, the court in *Strip Clean* held: "There can be no reliance on apparent authority unless the circumstances are such that the third party is entitled to rely thereon." *Id.*

■ In short, a recovery based on the doctrine of apparent authority does not require that the third party have inquired into the scope of the agent's authority. In

the apparent authority context, the duty to inquire only arises when "the facts and circumstances are such as to put him on inquiry," *id.*, the transaction is "extraordinary," *Collision Plan*, 63 N.Y.2d at 831, 482 N.Y.S.2d at 253, 472 N.E.2d at 29, or the "novelty" of the transaction alerts the third party to the danger of fraud, *General Overseas Films, Ltd. v. Robin Int'l, Inc.*, 542 F.Supp. 684, 696 (S.D.N.Y.1982), *aff'd without opinion*, 718 F.2d 1085 (2d Cir. 1983). Were this not the rule, such a duty of inquiry would nullify the doctrine of apparent authority in almost every case. Instead, the duty of inquiry amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal. *See Hallock*, 64 N.Y.2d at 231, 485 N.Y.S.2d at 513–14, 474 N.E.2d at 1181–82; *see also Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115–16 (2d Cir.1986) ("Ordinarily, absent awareness of facts indicating that a partner is acting beyond his real or apparent authority, a third party is not obligated to investigate the matter further or search for some limitation on that partner's authority.").

### 3. *Reasonable Reliance*

■ We next consider the district court's conclusion that no genuine issues of material fact exist concerning the question whether Herbert reasonably relied on Dixon's representations of authority. Several pieces of evidence persuade us that this question also should not have been resolved on summary judgment. To begin with, Herbert did not deal directly with Dixon and had never transacted business with him before. Herbert simply received the bond through the mail. Moreover, a five month delay occurred between the awarding of the subcontract, when a performance bond was requested, and the procurement of the performance bond. According to Continental, it is unusual for such bonds to be approved and issued months after the contract date. In addition, it remains uncertain whether the bond was regular on its face. Continental claims that the corporate seal on the bond was not its own. The financial statement

Dixon attached to the bond was at least two years old. Finally, the parties disagree on the relevant custom of the construction industry on this issue. Herbert asserts that "[i]t is the custom and practice in the construction industry and insurance industry for an obligee on a performance or payment bond, such as Herbert, to not contact the surety on that bond to verify the authority of the individual broker or agent who executed that bond on the surety's behalf." In its Rule 3(g) statement, Continental responded that "[t]here is no such 'custom and practice in the construction industry and insurance industry,'" and indicated that certain companies "routinely communicate with the surety to verify the authenticity of the bonds." Lending these facts the reasonable inferences to which Continental is entitled in opposing Herbert's motion, we believe a genuine issue of material fact was raised as to whether the circumstances surrounding the transaction should have alerted Herbert that something was amiss.

■ We also decline to follow Herbert's suggestion that Continental may be held liable solely because it did not notify third parties that Dixon's authority had been terminated. Under New York law, to be sure, "[a]pparent authority terminates when the third person has notice of the termination of the agent's actual authority." *Bernstein v. Centaur Ins. Co.*, 644 F.Supp. 1361, 1369 (S.D.N.Y.1986); *see also* Restatement (Second) of Agency § 125 (1958). That does not mean, however, that Continental's failure to give notice of the revocation of Dixon's power of attorney automatically entitles Herbert to rely on apparent authority. The question of notice, again, goes to whether Herbert reasonably relied on Dixon's appearance of authority. In the words of the Restatement:

> Apparent authority can exist only as long as the third person, to whom the principal has made a manifestation of authority, continues *reasonably to believe* that the agent is authorized. He does not have this *reasonable belief* if he has reason to know that the principal has revoked, or that the agent has renounced

the authority, or that such time has elapsed or such events have happened after the authorization as to require the reasonable inference that the agent's authority has terminated.

Restatement (Second) of Agency § 125 comment (b) (1958) (emphasis added).

For the above reasons, the district court should not have granted Herbert's motion for summary judgment.

C. Continental's Motion for Summary Judgment

We now consider the second general question presented on appeal: Should the district court have granted summary judgment in Continental's favor? Continental offers two arguments in support of its position that summary judgment dismissing the complaint should have been granted. First, Continental claims that it cannot be liable to Herbert under the doctrine of apparent authority, because Continental was not responsible for the indicia of authority that Dixon possessed. Second, Continental claims that the doctrine of apparent authority is not available to Herbert because Herbert neither knew nor dealt directly with Dixon. We reject both arguments.

■ As the moving party, Continental is no longer entitled to all reasonable inferences on these questions. Any reasonable inferences now favor the non-moving party, Herbert. In light of what we have said so far, Continental's first argument must fail. The question whether Continental was responsible for Dixon's possession of the power of attorney in question remains a genuine issue of material fact. We cannot say as a matter of law that Continental took sufficient precautions after revoking Dixon's power of attorney to warrant summary judgment in its favor. Dixon had possessed Continental's power of attorney for seven years and, after his power of attorney was revoked, he continued to be Continental's soliciting agent with regard to both insurance and surety bond applications. As Herbert points out, due to Continental's practices in giving its agents powers of attorney, Continental could not be certain that it retrieved all of the powers of attorney it had given to Dixon. If indeed Dixon retained a Continental power of attorney after the revocation, a jury could find Continental "responsible for the appearance of authority in the agent to conduct the transaction in question." *Ford*, 32 N.Y.2d at 473, 346 N.Y.S.2d at 244, 299 N.E.2d at 664; *see* Restatement (Second) of Agency § 130 comment (a) (1958). A jury could believe that Continental should have avoided the uncertainty surrounding the alleged retrieval by using original rather than facsimile power of attorney forms and by numbering each form sequentially, thus making it easier to account for all of its power of attorney forms. Finally, we note that Continental places substantial reliance on Dixon's hearsay statements, which were made at a meeting attended only by Continental employees and were included in the affidavit of Matthew Klimczak, a Continental employee. While the statements may be admissible as declarations against interest, Herbert is entitled to have them scrutinized by a jury given Dixon's history of dishonesty in these transactions and the unusual setting in which the statements were made.

Continental's responsibility, if any, for Dixon's appearance of authority ultimately settles into one significant issue of material fact: Should Continental have done more than it did to deprive Dixon of indicia of authority after it revoked his power of attorney? Resolution of this issue requires that evidence be weighed and inferences drawn, tasks that our legal system properly delegates to a jury.

■ Continental also contends that Herbert cannot rely on the doctrine of apparent authority because Herbert neither knew Dixon nor communicated directly with him. Continental fails to cite any cases directly supportive of this proposition of law. Nor does it provide a compelling rationale for adopting such a rule. Adoption of Continental's theory also would require us to condemn a custom, the existence of which is disputed, that in the construction industry no inquiry is made into the authenticity of bonds received in the

mail. We decline to do so on this record. Simply stated, the power of attorney attached to the other bond documents may provide a sufficient communication by the principal to all parties to a transaction, whether present at the signing of the documents or not, that the holder of the power has authority to bind the principal.

 Continental attempts to bolster its argument by pointing to a statement by the district court that Michaels, who negotiated with Dixon, would not have been able to rely on the doctrine of apparent authority; therefore, argues Continental, neither may Herbert. Judge Carter based this observation on Continental's refusal to issue bonds to Michaels eight months before the performance bond in question was issued. Continental had informed Michaels that it would not issue bonds to Michaels "at that time." Relying on this remark, Continental claims that "Herbert should be in the same position as Michaels" and thus should not be able to assert a complaint based on apparent authority. We disagree. Judge Carter correctly observed that Herbert stands "on a different footing" from Michaels. Nothing in the record indicates that Continental's earlier decision not to issue bonds to Michaels was conveyed to Herbert. Nor does Continental supply any rationale why knowledge of that meeting should be imputed to Herbert. Finally, Continental does not allege that Michaels participated in any fraud in obtaining the Continental performance bond through Dixon.

For the above reasons, we affirm Judge Carter's decision to deny Continental's cross-motion for summary judgment dismissing the complaint.

## CONCLUSION

To determine whether Herbert or Continental should bear the risk of the misdeeds of Dixon, several fact-specific inquiries need to be resolved at trial. Among the more important are the following. First, did Continental take all steps reasonably necessary to retrieve Dixon's indicia of authority? Second, if not, did Herbert reasonably rely on Dixon's appearance of au-

thority? We leave these inquiries to be answered by a jury, whose duty it is to weigh and evaluate the evidence developed at trial.

Accordingly, we affirm the district court's denial of Continental's cross-motion for summary judgment, vacate the district court's judgment in favor of Herbert and remand the case for further proceedings.