Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/28/2017 09:10 AM CDT

ROBERT L. KOHOUT, APPELLANT, V.
BENNETT CONSTRUCTION AND
THE TRAVELERS INDEMNITY
COMPANY, APPELLEES.

___ N.W.2d ___

Filed May 5, 2017.    No. S-16-609.

1. **Workers' Compensation: Appeal and Error.** Pursuant to Neb. Rev.
   Stat. § 48-185 (Cum. Supp. 2016), an appellate court may modify,
   reverse, or set aside a Workers' Compensation Court decision only when
   (1) the compensation court acted without or in excess of its powers; (2)
   the judgment, order, or award was procured by fraud; (3) there is not
   sufficient competent evidence in the record to warrant the making of the
   order, judgment, or award; or (4) the findings of fact by the compensa-
   tion court do not support the order or award.
2. ____: ____. Determinations by a trial judge of the Workers'
   Compensation Court will not be disturbed on appeal unless they are
   contrary to law or depend on findings of fact which are clearly wrong in
   light of the evidence.
3. ____: ____. An appellate court is obligated in workers' compensation
   cases to make its own determinations as to questions of law.
4. **Workers' Compensation: Independent Contractor: Insurance.** Under
   Neb. Rev. Stat. § 48-116 (Reissue 2010), a contractor's act of engaging
   a subcontractor without actually compelling the subcontractor to acquire
   workers' compensation insurance constitutes a device to escape liability
   under the Nebraska Workers' Compensation Act.
5. **Workers' Compensation: Insurance: Proof.** Under Neb. Rev. Stat.
   § 48-116 (Reissue 2010), a laborer has the burden to prove, by a pre-
   ponderance of the evidence, that the employer set up a scheme, artifice,
   or device to defeat provisions of the workers' compensation laws.
6. **Workers' Compensation.** Under Neb. Rev. Stat. § 48-116 (Reissue
   2010), the existence of a scheme, artifice, or device does not require
   active fraud or evil design.

7. **Principal and Agent.** Apparent authority is authority that is conferred when the principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon an actor's apparent authority.

8. ____. Apparent authority gives a professed agent the power to affect the principal's legal relationships with third parties. The power arises from, and is limited to, the principal's manifestations to those third parties about the relationships.

9. **Principal and Agent: Liability: Proof.** Apparent authority for which a principal may be liable exists only when the third party's belief is traceable to the principal's manifestation and cannot be established by the actor's acts, declarations, or conduct.

10. **Principal and Agent.** For apparent authority to exist, the principal must act in a way that induces a reasonable third person to believe that another person has authority to act for him or her.

11. ____. Whether an actor has apparent authority to bind the principal is a factual question determined from all the circumstances of the transaction.

12. ____. Indicia of authority expressing association with but not authority from a business may contribute to the impression of apparent authority, but that impression alone cannot bind the agent's principal to a third party.

13. **Joint Ventures: Partnerships: Contribution.** A joint venture is in the nature of a partnership and exists when (1) two or more persons contribute cash, labor, or property to a common fund (2) with the intention of entering into some business or transaction (3) for the purpose of making a profit to be shared in proportion to the respective contributions and (4) each of the parties have an equal voice in the manner of its performance and control of the agencies used therein, though one may entrust performance to the other.

14. **Joint Ventures: Proof.** The moving party bears the burden to prove a joint venture or enterprise exists by clear and convincing evidence.

15. **Joint Ventures: Intent.** The relationship of joint venturers depends largely upon the intent of the alleged parties as manifested from the facts and circumstances involved in each particular case.

16. **Joint Ventures.** A joint venture can exist only by voluntary agreement of the parties and cannot arise by operation of law. Even a close relationship between two parties does not create an implied joint venture.

17. ____. In considering whether a joint venture exists, the acts and circumstances between family members may not have the same significance as the same acts and circumstances between strangers might have.

Appeal from the Workers' Compensation Court: James R. Coe, Judge. Affirmed.

Michael W. Khalili and Terry M. Anderson, of Hauptman, O'Brien, Wolf & Lathrop, P.C., for appellant.

Julie A. Jorgensen, of Morrow, Willnauer, Klosterman & Church, for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Funke, J.

## NATURE OF CASE

Robert L. Kohout sustained an injury while performing construction work at the residence of Brian Shook. He sued Bennett Construction and its workers' compensation insurer for workers' compensation benefits. The Nebraska Workers' Compensation Court ruled that under Neb. Rev. Stat. § 48-116 (Reissue 2010), Bennett Construction was neither Kohout's direct employer nor his statutory employer, and dismissed the complaint. We affirm.

## FACTS

### Background

Bennett Construction is a sole proprietorship owned and operated by Mark Bennett. Mark testified that he typically works alone performing carpentry labor but hires subcontractors for jobs broader in scope than carpentry. He will also hire estimators to bid jobs for him during busy periods.

Nicholaus Bennett (Nick) is Mark's son. Nick owns and operates the sole proprietorships Nick Bennett Construction and Housecraft. He testified that he works as a contractor and subcontractor, primarily on roofing and guttering.

Mark and Nick testified that Nick worked for his father, as an estimator, until the work from a hailstorm in 2013 was

completed. Mark stated that he and Nick decided to work independently from that point so that Nick could begin building his own clientele. Nevertheless, Mark continued to hire Nick as a subcontractor for jobs with metal and gutter work.

In 2014, there was a severe hailstorm. The day after the hailstorm, Shook saw Nick patching a neighbor's roof and asked Nick to patch his roof as well. Shook testified that after Nick patched his roof, Nick left him a business card that included Nick's name, a cell phone number, and a "Bennett's Construction & Roofing" logo.

Shook testified that he later contacted Nick to provide a bid for more extensive repairs to his house and barn. Nick provided Shook an estimate on a proposal form labeled "Bennett's Construction & Roofing," with the business number for Bennett Construction crossed off and Nick's name and number written on the top. Shook never signed the proposal form, but both he and Nick testified that it reflected their verbal agreement. Nick subsequently completed the work.

Nick testified that he retained the Bennett Construction business cards and proposal forms from when he previously worked for the company. Nick stated that he used the proposal forms when he did not have anything else available and that when using the forms, he would sometimes explain that he did not work for Bennett Construction. Mark testified that he was unaware that Nick still used the company's proposal forms and business cards.

The portion of the proposal form relevant to this dispute reads: "Our workers are fully covered by Workmen's Compensation Insurance." Shook testified that he would not have hired Nick absent this affirmation. The record reflects that neither of Nick's sole proprietorships had workers' compensation insurance, but that Bennett Construction did.

Shook testified that Nick never told him he did not work for Bennett Construction and that he had never heard the name "Housecraft." But, Shook did testify that an invoice he received for work done on the property had "Nick Bennett"

printed on it. Nick testified that his invoices contained a Nick Bennett Construction logo.

Shook paid Nick for the repair work with four checks. The first check was written to "Nick Bennett's Construction" on August 21, 2014. The second check, dated September 18, 2014, was written to "Bennett's Construction." Mark testified that he cashed the check and wrote a check to Nick for the same amount after it cleared. Mark and Nick testified that Nick received checks in the name of Bennett Construction several times a year and that Mark always cashed them and reimbursed Nick to prevent him from having to obtain new checks from clients. After this check was received, Nick asked Shook to write future checks to "Nick Bennett." Shook wrote the final two checks to "Nick Bennett Construction" in 2015.

KOHOUT'S EMPLOYMENT

Kohout was looking for work in 2015 when a friend, who was employed by Nick, introduced Kohout to Nick. Nick hired Kohout, and Kohout began working at a job in Arlington, Nebraska. The Arlington job had been contracted by Mark, who hired Nick as a subcontractor.

Kohout's next project with Nick was the Shook job. Kohout testified that while only Nick regularly appeared and directed him at the Shook job, Mark did come to the property once during construction. Kohout believed it was to supervise the work. However, Mark testified he was there to obtain a tool that Nick had borrowed from him and that while he was there, he introduced himself to Shook as Nick's father and talked casually about the job with him before leaving. Shook testified that he did not know why Mark came to his property.

Nick testified that Kohout worked directly for him. Nick paid Kohout weekly with personal checks signed by him and identified as coming from "Housecraft." Nick supplied Kohout with the tools for the job, but Nick frequently borrowed Mark's tools.

On May 4, 2015, Kohout fell from the roof of the barn on Shook's property. As a result of the fall, Kohout suffered an injury.

## Procedural History

Kohout filed a petition against Bennett Construction and its workers' compensation insurer seeking workers' compensation benefits. In their answer, Bennett Construction and its insurer raised the affirmative defense that Kohout was not employed by Bennett Construction. The parties stipulated that Kohout's injury arose out of and in the course of employment.

After a trial, the court dismissed Kohout's petition. It ruled that Kohout was employed by either Nick Bennett Construction or Housecraft and that under § 48-116, Bennett Construction was neither Kohout's direct employer nor his statutory employer. The court stated that "[i]t is clear from [Shook's] testimony that Nick . . . was solely responsible for negotiating the job and performing and supervising the work at that site." Kohout appealed.

## ASSIGNMENT OF ERROR

Kohout assigns, restated, that the Nebraska Workers' Compensation Court erred by finding that Bennett Construction was not Kohout's employer under the Nebraska Workers' Compensation Act.

## STANDARD OF REVIEW

[1] Pursuant to Neb. Rev. Stat. § 48-185 (Cum. Supp. 2016), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings

of fact by the compensation court do not support the order or award.[1]

[2,3] Determinations by a trial judge of the Workers' Compensation Court will not be disturbed on appeal unless they are contrary to law or depend on findings of fact which are clearly wrong in light of the evidence.[2] An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law.[3]

ANALYSIS

Kohout contends that Bennett Construction is a statutory employer pursuant to § 48-116. Section 48-116 states:

> Any person . . . creating or carrying into operation any scheme, artifice, or device to enable him or her . . . to execute work without being responsible to the workers for the provisions of the Nebraska Workers' Compensation Act shall be included in the term employer, and with the immediate employer shall be jointly and severally liable to pay the compensation herein provided for and be subject to all the provisions of such act. This section, however, shall not be construed as applying to an owner who lets a contract to a contractor in good faith, or a contractor, who, in good faith, lets to a subcontractor a portion of his or her contract, if the owner or principal contractor, as the case may be, requires the contractor or subcontractor, respectively, to procure a policy or policies of insurance [that] guarantee[s] payment of compensation according to the Nebraska Workers' Compensation Act to injured workers.

[4] Under § 48-116, we have long held that a contractor's act of engaging a subcontractor without actually compelling

---

[1] *Interiano-Lopez v. Tyson Fresh Meats*, 294 Neb. 586, 883 N.W.2d 676 (2016).

[2] *Id.*

[3] See *id.*

the subcontractor to acquire workers' compensation insurance constitutes a device to escape liability under the Nebraska Workers' Compensation Act.[4] Neither of Nick's sole proprietorships had workers' compensation insurance at the time of the Shook job. Accordingly, if Mark's company was the general contractor of the Shook job and allowed either of Nick's sole proprietorships to act as a subcontractor, the company may be liable for Kohout's injury as a statutory employer.

[5,6] A laborer has the burden to prove, by a preponderance of the evidence, that the employer set up a scheme, artifice, or device to defeat provisions of the workers' compensation laws.[5] The existence of a scheme, artifice, or device does not require active fraud or evil design.[6]

Kohout asserts two theories under which Mark and Nick employed a "scheme, artifice, or device" that allowed Bennett Construction to avoid liability under the Nebraska Workers' Compensation Act. First, Kohout argues that Nick had the apparent authority to enter into a contract with Shook on behalf of Bennett Construction and that Nick was hired as an uninsured subcontractor to do the work on the job. Second, Kohout contends that Mark and Nick entered into a joint venture to obtain repair jobs after the 2014 hailstorm and that the Shook job was one of those joint ventures.

### NICK LACKED APPARENT AUTHORITY TO ENTER INTO CONTRACT WITH SHOOK ON BEHALF OF BENNETT CONSTRUCTION

[7-9] Apparent authority is authority that is conferred when the principal affirmatively, intentionally, or by lack of ordinary

---

[4] See *Rogers v. Hansen*, 211 Neb. 132, 317 N.W.2d 905 (1982), citing *Hiestand v. Ristau*, 135 Neb. 881, 284 N.W. 756 (1939), and *Sherlock v. Sherlock*, 112 Neb. 797, 201 N.W. 645 (1924), *disapproved on other grounds, Franklin v. Pawley*, 215 Neb. 624, 340 N.W.2d 156 (1983).

[5] *O'Brien v. Barnard*, 145 Neb. 596, 17 N.W.2d 611 (1945).

[6] See *Keith v. Wilson*, 165 Neb. 58, 84 N.W.2d 192 (1957).

care causes third persons to act upon an actor's apparent authority.[7] Apparent authority gives a professed agent the power to affect the principal's legal relationships with third parties.[8] The power arises from, and is limited to, the principal's manifestations to those third parties about the relationships.[9] Stated another way, apparent authority for which a principal may be liable exists only when the third party's belief is traceable to the principal's manifestation and cannot be established by the actor's acts, declarations, or conduct.[10]

[10,11] For apparent authority to exist, the principal must act in a way that induces a reasonable third person to believe that another person has authority to act for him or her.[11] Whether an actor has apparent authority to bind the principal is a factual question determined from all the circumstances of the transaction.[12]

Kohout argues that Nick acted with apparent authority to bind a contract between Shook and Bennett Construction because Nick provided Shook a business card identifying him as a representative of the company, Nick used one of the company's proposal forms, the company accepted a check from Shook, and Mark visited the Shook worksite on one occasion. Additionally, Kohout contends that because Mark took no action to disavow Nick as an agent of his company, Mark's lack of ordinary care caused Shook to believe the contract was with Mark and/or Bennett Construction. Kohout further contends that because Nick was a subcontractor on the Shook job and Mark did not compel Nick to obtain workers' compensation

---

[7] *RM Campbell Indus. v. Midwest Renewable Energy*, 294 Neb. 326, 886 N.W.2d 240 (2016).

[8] *State ex rel. Medlin v. Little*, 270 Neb. 414, 703 N.W.2d 593 (2005). See, also, 1 Restatement (Third) of Agency § 2.03 (2006).

[9] See *RM Campbell Indus., supra* note 7.

[10] See *id.*

[11] *Id.*

[12] *Id.*

insurance, Bennett Construction employed a device to avoid liability under the Nebraska Workers' Compensation Act and that therefore, it was Kohout's statutory employer.

Bennett Construction argues that it was not the principal or contractor of the Shook job and that Nick was solely responsible for negotiating, performing, and supervising the job. It contends that Mark made no representations to Shook, that Nick informed Shook he would be the contractor both orally and by altering the proposal, and that Bennett Construction retained no benefit from the Shook job.

The focal points of the analysis are the representations Mark and Bennett Construction made to Shook and what Shook could have reasonably believed based on those representations. Mark and Bennett Construction had only three interactions with Shook: First, after a previous hailstorm in 2009 or 2011, Mark may have given Shook an estimate for repairs which did not result in a contract; second, Bennett Construction cashed a check addressed to it by Shook; and third, Mark visited the Shook worksite on one occasion. However, Shook's testimony did not establish that he intended the check written to "Bennett's Construction" to actually go to Mark's company, as opposed to Nick, and Shook testified that he did not know why Mark had visited the worksite.

[12] Nick's actions are also relevant to the reasonableness of Shook's belief, but only insofar as they are traceable to Mark or Bennett Construction. The business card and proposal form presented by Nick were indicia of authority regarding Bennett Construction. However, the card contained nothing to verify that it was current or more than a declaration made solely by Nick, and the proposal form, altered by Nick, also provided no verification that Nick was authorized to enter into a contract on the company's behalf. Further, there was no evidence that Mark or Bennett Construction were aware that Nick had used the business card or the proposal form or that Mark or his company gave Nick permission to use either document. While such indicia of authority may contribute to

the impression of apparent authority, that impression alone cannot bind the agent's principal to a third party.[13]

When seeking an estimate for his repairs, Shook contacted Nick directly and had no communications through Mark or his company. Shook did not testify that Nick stated he was employed by Bennett Construction or that Shook's contract would be with Bennett Construction. In fact, Shook testified that Nick provided him with an invoice bearing Nick's name, not Bennett Construction, and that Nick asked him to write checks to Nick after Shook wrote the one check to "Bennett's Construction." The fact that Shook addressed his first check to "Nick Bennett's Construction" provides the most tangible evidence that he did not believe he had contracted with Bennett Construction.

Based on the preceding facts, Shook could not have reasonably believed that he was contracting with Mark or Bennett Construction. Shook's testimony does not show that Mark or his company manifested any authority to him. The indicia of authority alone—the business card and the proposal form— does not provide a reasonable basis to conclude the contract was with Bennett Construction. Finally, Shook's actions show that he did not actually believe he had contracted with someone other than Nick. Therefore, we find that Nick lacked the apparent authority to bind Bennett Construction to the contract with Shook and that as a result, Shook entered the contract with Nick alone.

### NICK DID NOT ENTER INTO JOINT VENTURE WITH MARK OR BENNETT CONSTRUCTION

[13,14] A joint venture is in the nature of a partnership and exists when (1) two or more persons contribute cash, labor, or property to a common fund (2) with the intention of entering into some business or transaction (3) for the purpose of making

---

[13] *Herbert Const. Co. v. Continental Ins. Co.*, 931 F.2d 989 (2d Cir. 1991).

a profit to be shared in proportion to the respective contributions and (4) each of the parties have an equal voice in the manner of its performance and control of the agencies used therein, though one may entrust performance to the other.[14] The moving party bears the burden to prove a joint venture or enterprise exists by clear and convincing evidence.[15]

[15-17] The relationship of joint venturers depends largely upon the intent of the alleged parties as manifested from the facts and circumstances involved in each particular case.[16] A joint venture can exist only by voluntary agreement of the parties and cannot arise by operation of law. Even a close relationship between two parties does not create an implied joint venture.[17] In considering whether a joint venture exists, the acts and circumstances between family members may not have the same significance as the same acts and circumstances between strangers might have.[18]

Kohout also argues that Mark and Nick employed a joint venture as a scheme to avoid liability under the Nebraska Workers' Compensation Act, citing *Thomas v. Hansen*.[19] He contends that Mark and Nick had a common purpose of securing as much work from the hailstorm for their family as possible and that Mark allowed Nick to use his proposal forms to induce business based on the statement about workers' compensation coverage.

In *Thomas*, the Iowa Supreme Court held that Hansen & Sons Welding (Hansen) and Leo Morgan were engaged in a joint venture when Morgan's employee, Edward Thomas, was injured. Hansen had agreed to bill a packing plant with which

---

[14] See *Lackman v. Rousselle*, 257 Neb. 87, 596 N.W.2d 15 (1999).

[15] See *id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Thomas v. Hansen*, 524 N.W.2d 145 (Iowa 1994).

Hansen had a contract on Morgan's behalf for 8 percent of Morgan's portion of the contract, because Morgan did not have workers' compensation insurance and the packing plant would not contract with uninsured contractors. The court identified that Hansen paid Thomas and that Hansen and Morgan often exchanged workers and exercised mutual control over them. The court found that the facts showed the only reason for the arrangement was to avoid workers' compensation laws. The court stated that although there was conflicting evidence of whether a joint venture existed, based on the strong evidence of the parties' intent, a joint venture did exist, and that Hansen was liable for Thomas' injuries.[20]

In *O'Brien v. Barnard*,[21] we considered whether a lease arrangement constituted a "scheme, artifice, or device" under § 48-116. Raymond Barnard operated a gas station, which he leased from Charles Larsen. At the inception of the lease, Larsen provided Barnard a $1,000 loan, which Barnard agreed to repay at the rate of one-half cent per gallon of gas purchased until paid in full, plus interest. He also paid Larsen 1 cent per gallon of gas purchased for rent. Barnard purchased all of his gas and products through Larsen, who was a sales representative for a petroleum company.

The plaintiff in *O'Brien*, who was an employee at the gas station, claimed that Larsen was a statutory employer, because he set up the business through Barnard to increase his own income, essentially claiming that a joint venture existed. We held that Larsen was not a statutory employer.[22] In doing so, we noted that (1) Larsen did not contribute financially to the station because his $1,000 loan was being repaid by Barnard; (2) Larsen did not control, supervise, or give direction on the station's management or to Barnard's employees; (3) Larsen

---

[20] *Id.*

[21] *O'Brien v. Barnard, supra* note 5.

[22] *Id.*

did not share in the profits of the station; and (4) there was no evidence that Larsen and Barnard intended to enter into business together.[23] While we determined that the facts of the case did not warrant liability for the alleged joint venture, we did not foreclose applicability of the concept.

Here, Kohout has failed to show by clear and convincing evidence that Nick engaged in a joint venture with Mark or Bennett Construction on the Shook job.

First, because a joint venture cannot arise as an operation of law, there must be evidence that Mark and Nick intended to enter into a voluntary agreement. In *Thomas*, the circumstances implied that Hansen and Morgan made an agreement to avoid the packing plant's prohibition on contracting with uninsured contractors, because there was no other reasonable explanation for their arrangement and there was also direct evidence that they had agreed to the joint venture.[24] In *O'Brien*, Larsen's arrangement with Barnard was beneficial to Larsen individually and as a sales representative, but we did not infer from this that Larsen and Barnard were joint venturers.[25]

Kohout failed to elicit evidence that Mark and Nick had the intent to enter into a joint venture to complete the Shook job. Mark and Nick both testified that Nick was operating his own business after the hailstorm. Though Kohout argues that Nick testified that he occasionally worked on jobs with Mark and split the profits, there is no evidence regarding those jobs or that this was the situation on the Shook job. While Nick continued to be a subcontractor for Mark on other jobs, there is no evidence that Nick benefited more than any other subcontractor would have or that his subcontracting constituted a joint venture.

---

[23] *Id.*

[24] See *Thomas v. Hansen, supra* note 19.

[25] See *O'Brien v. Barnard, supra* note 5.

While Nick testified that he intended people to rely on the statement concerning workers' compensation insurance in the proposal form, there was no evidence that Mark or Bennett Construction was complicit or even aware of Nick's actions.

In addition, there is neither circumstantial evidence that Mark would have entered into a joint venture with Nick's sole proprietorships nor direct evidence that he did, as was the case in *Thomas*. Further, there is no evidence as to how such an arrangement would have benefited Bennett Construction, as was the case in *O'Brien*. Accordingly, we cannot infer a voluntary agreement or an intent by Mark and Nick to enter a joint venture on the Shook job.

Second, there is no evidence that Mark contributed cash or labor to the Shook job. While Kohout established that Nick, at times, used some of Mark's tools, he did not show that this provided a significant contribution to the Shook job. Further, we recognize our statement in *Lackman v. Rousselle*[26] that circumstances between family members are not the same as strangers; a father allowing his son to use tools is an incident of their closeness and does not alone imply a joint venture.

Third, there is no evidence that Mark and Nick split the profits from the Shook job. In fact, there is no evidence that Mark profited from the Shook job at all. While Mark did cash the check Shook wrote to "Bennett's Construction," he testified that he provided Nick with a check for the full amount shortly thereafter.

Fourth, there is no evidence that Mark had an equal right to control the performance at the Shook worksite. Though Mark visited the site on one occasion, neither Kohout nor Shook testified that Mark directed any actions at the site or examined the work. While Mark could have entrusted performance of the Shook job to Nick under a joint venture, Kohout failed to show any evidence that would warrant such a determination.

---

[26] *Lackman v. Rousselle, supra* note 14.

Accordingly, we hold that neither Mark nor Bennett Construction was engaged in a joint venture with Nick concerning the Shook job.

## CONCLUSION

We find that the Nebraska Workers' Compensation Court's application of § 48-116 was not contrary to law and that its determination that Bennett Construction was not Kohout's statutory employer was not clearly wrong in light of the evidence. Therefore, for the reasons stated above, we affirm the judgment of the court.

AFFIRMED.