The ESTATE OF Edward
F. DERMADY, et al.,
Plaintiffs,

v.

EASTMAN KODAK COMPANY,
et al., Defendants.

No. 98–CV–6009L.

United States District Court,
W.D. New York.

March 31, 2001.

Norman M. Spindelman, Fix, Spindelman, Brovitz, Turk, Himelein & Shukoff, P.C., Rochester, NY, for plaintiffs.

Stephanie M. Caffera, Eugene D. Ulterino, Nixon Peabody LLP, Rochester, NY, for defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

## INTRODUCTION

Plaintiffs, Beverly Dermady ("Mrs. Dermady") and The Estate of Edward F. Dermady, commenced this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiffs allege that defendants, Eastman Kodak Company ("Kodak"), the Kodak Retirement Income Plan Committee ("KRIP-CO"), and the Kodak Retirement Income Plan ("the Plan"), provided plaintiffs with inadequate and misleading information concerning plaintiffs' rights and obligations under the Plan relating to the benefits to which Mrs. Dermady would be entitled in the event of the death of her husband, Edward Dermady ("Mr. Dermady") prior to his retirement from Kodak. As a result, plaintiffs allege, Mr. Dermady did not retire prior to his death at age fifty-three on February 7, 1997, causing Mrs. Dermady to receive only a relatively modest survivor's benefit instead of the larger lump-sum retirement benefit that she and Mr. Dermady would have received had Mr. Dermady retired.

The complaint asserts two causes of action. The first alleges that defendants failed to provide plaintiffs with an adequate Summary Plan Description ("SPD") as required by 29 U.S.C. § 1022(a)(1). The second alleges that defendants' misrepresentations, or failure to inform plaintiffs, of material facts regarding Plan benefits constituted a breach of defendants' fiduciary duty in violation of 29 U.S.C. § 1104. Plaintiffs seek declaratory relief and an amount equal to the lump-sum retirement benefit that Mr. and Mrs. Dermady would have received upon Mr. Dermady's retirement. Plaintiffs also request a trial by jury.

Defendants have moved for summary judgment dismissing the complaint pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons that follow, defendants' motion is granted in part and denied in part.

## FACTUAL BACKGROUND

At the time of his death, Mr. Dermady had been a Kodak employee for over twenty-eight years. Mr. Dermady was a participant in the Plan, and he and Mrs. Dermady were Plan beneficiaries.

On November 19, 1996, as a result of an illness that would later be diagnosed as lymphoma, Mr. Dermady began a leave of absence, which continued until his death roughly two and a half months later. Plaintiffs allege that during that period, Mr. and Mrs. Dermady dealt exclusively with Reivon Drexel, a disability coordinator in Kodak's "DisABILITY Management Organization" ("DMO"), regarding any and all matters relating to Mr. Dermady's disability leave.

Plaintiffs allege that on December 9, 1996, Mrs. Dermady contacted Drexel by telephone, principally to complain that

Kathleen A'Brunzo, R.N., a Nurse Case Manager, had been calling the Dermady residence frequently, which Mrs. Dermady considered to be harassing and wanted stopped. Drexel, seeking to calm Mrs. Dermady, Drexel Depo. (Affirmation of Norman M. Spindelman Ex. F) at 97–104, told her that during Mr. Dermady's leave of absence, she would be the Dermadys' "single point of contact for all of [their] needs...." Dermady Depo. (Affidavit of Eugene D. Ulterino Ex. P) at 61. Drexel herself testified that she told Mrs. Dermady, "While your husband is out ill, I'll be your point of contact." Drexel Depo. at 103.

Mrs. Dermady also testified that during this conversation, she told Drexel that she "was not familiar with the Disability Management Team, I didn't know what that was, and [Drexel] told me that it was part of Benefits and that it was there to help Eddie and I through his disability and that [Drexel] would take care of all our needs." Dermady Depo. at 61. Mrs. Dermady testified that she asked Drexel, "Well, at this point would you then be part of Benefits?," to which Drexel allegedly responded, "Yes, we are part of Benefits, we have been incorporated into Benefits and we are part of Benefits." Dermady Depo. at 65. At her own deposition, however, Drexel denied having told Mrs. Dermady that the DMO was part of the Benefits Department. Drexel Depo. at 117.

Mrs. Dermady and Drexel had a second conversation several days later, during which they discussed the subject of retirement benefits. Mrs. Dermady testified that "because of the severity of his illness," Mr. Dermady "wanted to make sure that [their daughter] Jacqueline and [Mrs. Dermady] would be taken care of and he wanted to know at that point what needed to be done to secure those [retirement] benefits," so he asked Mrs. Dermady "to call and find out." Dermady Depo. at 22–23.

Mrs. Dermady testified that Drexel "told me that I was not to be concerned with that at that time and that I was to concentrate on taking care of Eddie, that I should not be concerned with Eddie's retirement benefits at that time, I should concentrate on taking care of my husband and I had enough to handle at that time." Dermady Depo. at 21. Dermady testified that Drexel told her "that there would be several options available and that Kodak would advise us as to which options would be best for us and that they would do whatever was in the best interest of the Dermady family." Dermady Depo. at 20–21. Drexel allegedly did not state what the options would be, but "just said several options would be available." Dermady Depo. at 22. Drexel did not advise Mrs. Dermady to call anyone else for further information about retirement benefits. Dermady Depo. at 24.

Drexel related her recollection of this conversation in a letter that she prepared following Mr. Dermady's death, after Mrs. Dermady had been informed by the Benefits Department that she was not entitled to retirement benefits because Mr. Dermady had never retired. At Mrs. Dermady's request, Drexel wrote a letter for her, which Mrs. Dermady planned to use in her attempt to obtain retirement benefits. In the letter, dated March 6, 1997, Drexel stated, *inter alia:*

> During Edward's absence we spoke on the phone regarding his illness and treatment program. In one of those conversations, you asked questions regarding Edward's benefits if he should pass away. I told you when the time comes, the Benefits Dept. would explain Edward's entitlements to you. You called when Edward passed away and I

gave you the number for Benefits to call and report Edward's passing.

From our recent conversations, I understand that you have continuing concerns regarding your husband's benefit entitlements. My role in your husband's situation was strictly limited to the management of his illness absence. I do not have the expertise or authority to assist you with regards to any benefits issues. You will need to address those concerns through the established processes outlined in "You and Kodak"[1] and as you are advised by the Benefits Dept.

Spindelman Aff. Ex. B.

At her deposition, which was taken on July 28, 1999, Drexel stated that she could not recall the conversation referred to in this letter. However, she admitted having written the letter, she did not deny that the conversation had occurred as described in the letter, and she stated that she must have recalled the conversation at the time that she wrote the letter. Drexel Depo. at 140–42.

Drexel also testified that before sending the letter to Mrs. Dermady, she showed it to Clara Ooyama, who was then the director of the DMO. She stated that she explained to Ooyama that she was writing the letter at Mrs. Dermady's request, "but not in the way [Mrs. Dermady] wanted [Drexel] to." She stated, "Mrs. Dermady wanted me to write a letter stating that I had given her advice about retirement benefits, which I hadn't, I refused to write a letter like that for her." According to Drexel, Ooyama "looked [the letter] over and said, go ahead and send it." ' Drexel Depo. at 138–39.

Plaintiff alleges that it had been Mr. Dermady's intention to take a lump-sum benefit upon his retirement. Dermady Depo. at 32. Had he retired effective February 1, 1997, the last date that he could have done so prior to his death, Mr. Dermady would have received a lump sum of $138,148. Ulterino Aff. Ex. I. Mrs. Dermady testified at her deposition that she had not been aware prior to Mr. Dermady's death that he would have had to retire in order to take a lump-sum payment. Dermady Depo. at 119.

On February 8, 1997, Mrs. Dermady contacted Drexel to inform her that Mr. Dermady had passed away the previous day. Drexel told Mrs. Dermady that she should contact the Benefits Department. When Mrs. Dermady did so, she was told by a benefits information representative that she could not receive retirement benefits because Mr. Dermady had died as an active employee. Dermady Depo. at 79.

Over the next several months, Mrs. Dermady contacted various persons within the Benefits Department in an attempt to clarify her rights and to determine if there was some way that she could obtain retirement benefits. At some point she also retained counsel. In a letter dated May 27, 1997, Pamela Cromp (whose job title is not identified) informed Mrs. Dermady's then-attorney that because Mr. Dermady never retired, Mrs. Dermady was "not eligible to receive any retirement income benefits, but instead was eligible to receive a qualified pre-retirement survivor annuity option (QPSA) in the monthly amount of $441.44, effective March 1, 1997." Ulterino Aff. Ex. G.

By letter dated July 23, 1997, Mrs. Dermady filed an appeal with KRIPCO. Ulterino Aff. Ex. G. In a letter dated October 8, 1997, Charles Singleton of KRIPCO in-

---

**1.** It appears that "You and Kodak" is the title of the SPD that was provided to Kodak employees, as well as the title of a periodically issued benefits update. *See* Ulterino Aff. Exs. M, O.

formed Mrs. Dermady's attorney that he found "no evidence of Company error or wrongdoing, or any other reason to overturn the initial decision. I must concur, therefore, with the answer that Ms. Cromp has given to you." Ulterino Aff. Ex. H. Plaintiffs commenced this action on January 8, 1998.

## DISCUSSION

### I. Summary Judgment–General Standards

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and all ambiguities and inferences that may be reasonably drawn from the facts must be viewed in the light most favorable to the non-moving party. *Coach Leatherware Co. v. Ann-Taylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991). To defeat a motion for summary judgment, the non-moving party must go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

On a motion for summary judgment, then, the court is charged with the duty of "issue finding," not "issue resolution." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). To put it another way, "[o]n a motion for summary judgment, a court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36–37 (2d Cir.1994) (quoting *Donahue v. Windsor Locks Bd. of Fire Comm.*, 834 F.2d 54, 58 (2d Cir.1987)).

### II. Defendants' Motion

### A. Breach of Fiduciary Duty Claim

Having reviewed the record, and viewing that record in the light most favorable to plaintiffs, the non-moving parties, I find that there are genuine issues of material fact in this case that preclude the entry of summary judgment for defendants on plaintiffs' claim that defendants breached their fiduciary duties under 29 U.S.C. § 1104. In particular, there are issues concerning whether Drexel was cloaked with apparent authority to make representations to Mrs. Dermady with respect to her and Mr. Dermady's retirement benefits, the exact nature of any such representations that she did make, and whether Mrs. Dermady reasonably relied on those representations to her detriment.

### 1. Drexel's Apparent Authority

Plaintiffs allege that Drexel's alleged misrepresentations to Mrs. Dermady about Mr. Dermady's retirement benefits-particularly Drexel's statements that there was no need for Mr. or Mrs. Dermady to take any actions until "the time comes," when someone from the Benefits Department would contact them-were binding upon defendants in their fiduciary capacity because Drexel was acting with apparent authority when she made those statements. Defendants contend that Drexel had no authority in that regard, either actual or apparent.

As the Second Circuit explained in *Minskoff v. American Express Travel Related Services Co.*, 98 F.3d 703, 708 (2d

Cir.1996), "[a]pparent authority is entirely distinct from authority, either express or implied, and arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him. Apparent authority, then, is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent." (Internal quotes and citations omitted.) *See also Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989).

In *Minskoff,* the Court of Appeals also cautioned that "[t]he existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." 98 F.3d at 708 (citing *Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 994 (2d Cir.1991)). The court added, however, that "a principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change in position on the part of the third party." *See also* Restatement (Second) of Agency § 8B (1958); *Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 665 (2d Cir.1964).

In the case at bar, although the matter is a close one, I believe that plaintiffs have presented sufficient evidence to give rise to a genuine issue of fact about whether defendants' acts or omissions created an appearance of authority in Drexel such that Mrs. Dermady could reasonably have relied on her statements concerning Mr. Dermady's retirement benefits, with the result that Mr. Dermady failed to retire from Kodak before he died, thereby causing Mrs. Dermady to be denied retirement benefits. As the Second Circuit stated in *Minskoff,* that issue is "inappropriate for resolution on a motion for summary judgment." Keeping in mind that the focus must be on the acts of defendants, but also that the court must "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [her] favor," *McKelvie v. Cooper,* 190 F.3d 58, 61 (2d Cir.1999), the following evidence is before the court.

Mrs. Dermady testified that at some point after Mr. Dermady's leave of absence began, the Dermadys received a letter from the DMO, together with a small card bearing the names and telephone numbers of several DMO members. The letter told the Dermadys that they should "contact these people," *i.e.*, the people whose names were on the card, concerning Mr. Dermady's disability. Dermady Depo. at 54–56. Mrs. Dermady did contact one of those persons, Reivon Drexel. During their first conversation, Drexel told Mrs. Dermady that Drexel "would be the single source of contact at Kodak for all of [the Dermadys'] needs, for whatever needs [they] needed." Dermady Depo. at 64. Mrs. Dermady also asked Drexel "to explain to [her] what they [*i.e.*, the DMO] did ... because [Mrs. Dermady] was not familiar with" the DMO. Drexel responded that "she was there to take care of all of Ed's needs as far as his disability." Mrs. Dermady then asked, "Well, at this point would you then be part of Benefits?," to which Drexel allegedly responded, "Yes, we are part of Benefits, we have been incorporated into Benefits and we are part of Benefits." Dermady Depo. at 65.

In their subsequent conversation, Mrs. Dermady specifically asked Drexel about Mr. Dermady's retirement benefits. Ac-

cording to Mrs. Dermady, Drexel told her "not to be concerned with Eddie's retirement benefits at that time," but instead to "concentrate on taking care of" Mr. Dermady. Dermady Depo. at 21. Dermady also testified that Drexel told her "that Kodak would advise [the Dermadys] as to which options would be best for [them] and that they would do whatever was in the best interest of the Dermady family." Dermady Depo. at 20–21. Drexel did not tell Mrs. Dermady that Mrs. Dermady should call anyone else for further information. Dermady Depo. at 24.

Drexel's own account of this conversation, as recited in her March 6, 1997 letter, generally agrees with Mrs. Dermady's. In fact, in one respect it even strengthens plaintiffs' claims of reliance, because according to Drexel, Mrs. Dermady specifically asked her what would happen "regarding Edward's benefits if he should pass away." Drexel stated that she told Mrs. Dermady in response that "when the time comes, the Benefits Dept. would explain Edward's entitlements to" her. Although Drexel also asserted in her letter that her "role in [Mr. Dermady's] situation was strictly limited to the management of his illness absence," because Drexel "d[id] not have the expertise or authority to assist [Mrs. Dermady] with regards to any benefits issues," a finder of fact would not necessarily have to accept that after-the-fact characterization of Drexel's statements to Mrs. Dermady concerning Mr. Dermady's benefits.

It should also be noted that when the Dermadys first began dealing with Drexel and the DMO, the DMO itself was in its infancy; in fact, "prenatal stage" might be more accurate. Ooyama testified at her deposition that the DMO "actually was formed effective January 20," 1997. Ooyama Depo. (Spindelman Aff. Ex. C) at 5. Ooyama first learned of the decision to create the DMO in October 1996. Ooyama Depo. at 10. She stated that the purpose of the DMO was "[t]o manage the entire organization and to create one organization that managed both the short-term Disability and Workers' Compensation absences of Kodak employees." Ooyama Depo. at 9. Prior to the creation of the DMO, the functions of the DMO had been carried out by two separate organizations within Kodak. Ooyama Depo. at 12–13. In addition, Drexel testified that she first saw her job description for her Disability Coordinator position "[r]ight after it was initiated," which to the best of her recollection was around September 1996. Drexel Depo. at 53.

When Mrs. Dermady began dealing with Drexel, then, it is hardly surprising that she "was not familiar with the Disability Management Team," or that she "didn't know what that was . . . ." Dermady Depo. at 61. She only knew that she and Mr. Dermady had received a letter from Kodak stating that they should contact someone on the DMO, which Mrs. Dermady proceeded to do, and when she did, the person she spoke with, Drexel, told her that: Drexel would be her "single point of contact for all of [the Dermady's] needs"; the DMO "ha[d] been incorporated into Benefits and [was] part of Benefits"; "Kodak would advise [the Dermadys] as to which [benefits] options would be best for [them] and that [Kodak] would do whatever was in the best interest of the Dermady family"; and in the event of Mr. Dermady's death, "when the time c[ame], the Benefits Dep[artment] would explain Edward's entitlements" to Mrs. Dermady.

That is not to say, of course, that this evidence must lead inescapably to the conclusion that Drexel had apparent authority to speak on defendants' behalf regarding Mr. Dermady's retirement or other benefits. A factfinder might well conclude, for

example, that Drexel's statement about being the Dermadys' "sole" or "single" point of contact, taken in context, was intended only to assuage Mrs. Dermady's concerns about what she perceived to be harassing telephone calls from Kathleen A'Brunzo. Plaintiffs, however, are not the moving parties here; to defeat defendants' motion, they need only show that, viewing the evidence most favorably to them, a reasonable inference *could* be drawn that Drexel did have apparent authority in this regard. I find that they have made such a showing.

Several statements in Drexel's job description are also noteworthy. Under the heading, "Key Functions," the description states, *inter alia,* "Educate employees and departments on illness absence processes/procedures." The document states that a Disability Coordinator must "[i]nterface[ ] [w]ith" a number of other employees and Kodak organizations, including "HR/Benefits." Among the "Key Job Skills/Attributes" required for the job is that the Disability Coordinator have "a working knowledge of" several items, including the "[b]enefits structure." Spindelman Aff. Ex. A.

Defendants point out that Mrs. Dermady had not seen this job description at the time of her dealings with Drexel, and that it therefore could not have played a part in any belief that she may have had that Drexel had authority to advise her about retirement benefits. Nevertheless, these statements indicate some awareness on defendants' part that an employee in Drexel's position might at times be asked questions by Plan participants about their benefits, and that she should be able to provide them with some guidance in that area. *Cf. Taylor v. Peoples Natural Gas Co.,* 49 F.3d 982, 989 (3d Cir.1995) ("defendants' undisputed vesting of [the Supervisor of Employee Benefits, who was not a member of defendant Annuities and Bene-

fits Committee, the plan administrator] with the authority to 'advise employees of their rights and options under the Pension Plan' clearly constitutes a manifestation that he was their agent").

The fact that, pursuant to defendants' standard operating procedures, Drexel perhaps *should* have advised Mrs. Dermady to contact the Benefits Department about her questions, *see* Drexel Depo. at 142, but did not, does not mean that an inference could be not drawn that Drexel was charged with *some* responsibility for answering questions about benefits, even if that responsibility was limited to referring clients to the Benefits Department. Based on the evidence before me, I believe that a finder of fact could conclude that while Drexel may have overstepped her actual authority, her statements to Mrs. Dermady about Mr. Dermady's benefits were nevertheless sufficiently related to her actual job duties that she did speak with apparent authority.

Furthermore, although defendants attempt to distinguish between Drexel's authority to make representations or give advice concerning Mr. Dermady's disability leave, and her authority (or lack thereof) to make representations about his benefits or retirement, that again leads to factual issues that are not resolvable on a motion for summary judgment. "[W]hen a principal refers others to an agent ... for information, such person becomes the spokesman for the principal to them, with apparent authority to make statements upon the subject matter as to which reference is made, and the principal is bound by such apparently authorized statements or promises." Restatement (Second) of Agency, § 159 cmt. f (1983) (quoted in *Richards v. General Motors Corp.,* 991 F.2d 1227, 1232 (6th Cir.1993)). Defendants contend that they did *not* refer Mrs. Dermady or anyone to Drexel or the DMO

for information about benefits, but only for information related to disability leave. On the facts presented here, however, a jury might conclude that the line between benefits and disability-related matters was less distinct than defendants maintain, and that Mrs. Dermady's inquiries really related to both. Although Mrs. Dermady's account of her conversation with Drexel concerning benefits that she gave at her deposition was not identical to Drexel's recitation in her March 1997 letter, in both accounts, Mrs. Dermady's questions involved the relationship between those benefits and Mr. Dermady's illness: either what needed to be done in order to secure his retirement benefits, or what the effect upon his benefits would be if Mr. Dermady were to pass away. One could conclude, then, that Mrs. Dermady did not simply ask a purely benefits-related question, such as the present amount of Mr. Dermady's accrued benefit, but that her question also related to Mr. Dermady's disability leave and the underlying reason for that leave. Since there is also evidence upon which one could find that Mrs. Dermady had been led to believe-not just by Drexel but by defendants as well-that all leave or disability-related inquiries should be directed to Drexel-I conclude that she has demonstrated the existence of genuine issues of material fact about whether Drexel spoke with apparent authority on these matters.[2]

## 2. Material Misrepresentation

■ To establish a claim for breach of fiduciary duty based on alleged misrepresentations concerning coverage under an ERISA plan, the plaintiff must show: (1) that the defendant was acting in a fiduciary capacity when it made the alleged mis-

representations; (2) that the defendant made a material misrepresentation; and (3) that the plaintiff relied on that misrepresentation to his detriment. *Varity Corp. v. Howe*, 516 U.S. 489, 498, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122, 126 (2d Cir.1997). For the reasons set forth above, I find that there are factual issues concerning whether Drexel's alleged misrepresentations to Mrs. Dermady were made with apparent authority to speak on their behalf. If she did speak with apparent authority, I also believe that the evidence would support a finding that those statements were made in a fiduciary capacity. Certainly if Mrs. Dermady had asked KRIPCO about her husband's benefits as they related to his disability leave, KRIPCO would have had a fiduciary duty to provide her with accurate and truthful information in response. *See Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir.2001) ("Communicating information about future plan benefits is indeed a fiduciary obligation"); (citing *Varity*, 516 U.S. at 498–99, 116 S.Ct. 1065); *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 8 (2d Cir.1997) (agreeing with other courts of appeals that "ERISA fiduciaries must provide complete and accurate information in response to beneficiaries' questions about plan terms and/or benefits"); *Cerasoli v. Xomed, Inc.*, 972 F.Supp. 175, 179 (W.D.N.Y.1997) ("informing employees about the existence or extent of their coverage could itself be considered a fiduciary act").

■ The next issue, then, is whether issues of fact exist concerning whether Drexel made any material misrepresenta-

---

2. As explained by the Second Circuit in *Minskoff*, to bind a principal on the basis of apparent authority requires not only that the principal have created the appearance of actual authority, but also detrimental, good-faith reliance by a third party. Since such reliance is also an element of plaintiffs' breach of fiduciary duty claim under ERISA, however, that element will be discussed in Part 3, below.

tions to Mrs. Dermady. This matter requires little discussion, and indeed defendants themselves do not appear to contend that Drexel's alleged advice to Mrs. Dermady was accurate or immaterial. Essentially, Drexel—who knew that Mr. Dermady had been diagnosed with lymphoma, *see* Drexel Depo. at 118—told Mrs. Dermady that neither she nor Mr. Dermady needed to do anything about his benefits, and that Kodak would tell them what was best for them at the appropriate time. It is uncontested, however, that Mr. Dermady would have had to retire in order for Mrs. Dermady to collect retirement benefits in the event of his death. Mr. Dermady therefore needed to take steps to effect his retirement, and Drexel's advice—which was basically to do nothing—can hardly be considered immaterial.

### 3. Reasonable Reliance

■ The third element of plaintiffs' claim for breach of fiduciary duty is that they relied on defendants' misrepresentation to their detriment. *Law v. Ernst & Young*, 956 F.2d 364, 368 (1st Cir.1992); *McDonald v. Pension Plan of NYSA–ILA Pension Trust Fund*, No. 99 Civ. 9054, 2001 WL 303746 *19 (S.D.N.Y. Mar. 29, 2001).[3] In addition, to bind defendants by Drexel's alleged misrepresentations based on her apparent authority, they must show that Mrs. Dermady reasonably and in good faith relied on those misrepresentations,

and that her reliance resulted in a detrimental change in position on plaintiffs' part. I find that there are issues of fact concerning this element as well.

In support of their motion, defendants do not appear to contend that there is no evidence that plaintiffs *did* rely on Drexel's advice "not to be concerned with" retirement benefits at that time, and to wait until "the time c[ame]," when the Benefits Department would "explain" plaintiffs' benefits to Mrs. Dermady. If Mrs. Dermady's deposition testimony were credited, a factfinder could conclude that it had been Mr. Dermady's intention to retire and take a lump-sum payment, but that, relying on Drexel's assurances that "Kodak would advise [the Dermadys] as to which options would be best for [them] and that they would do whatever was in the best interest of the Dermady family," plaintiffs took no steps to effect Mr. Dermady's retirement. Likewise, if indeed plaintiffs did so rely on the alleged misrepresentations, one could find that their reliance proved to be detrimental to plaintiffs, since instead of a lump sum of $138,148, plaintiffs got only Mrs. Dermady's monthly annuity of $441.44.[4]

Defendants contend, however, that plaintiffs could not *reasonably* have relied on Drexel's alleged misrepresentations. The basis for this assertion is defendant's contention that the SPD made it clear that: retirement benefits would not be

**3.** As explained by the court in *Pocchia v. Prudential Ins. Co.*, 74 F.Supp.2d 240, 250 n. 7 (E.D.N.Y.1999), "whether a showing of detrimental reliance is necessary to prevent enforcement of undisclosed plan terms, or whether a showing of prejudice would suffice by itself, is a question that is not entirely settled in this Circuit." *See Lee v. Burkhart*, 991 F.2d 1004, 1011 (2d Cir.1993) (assuming without holding that plaintiff must prove detrimental reliance where ERISA fiduciary misrepresents plan provisions in communications with employees). As explained in this Decision and Order, however, I find that even if

plaintiffs must show some detriment flowing from their reliance, plaintiffs have presented enough evidence to give rise to an issue of fact in that regard.

**4.** Apparently Mrs. Dermady also receives, or has received, other benefits such as life insurance benefits, Savings and Investment Plan benefits, and so on, *see* Ulterino Aff. Ex. J, but it appears that she would have received those in any event, and they are not at issue in this case.

available to an employee's estate or survivors if the employee died before his effective date of retirement, regardless of whether the employee had been eligible for retirement by the time of his death; and questions about benefits should be directed to the Benefits Information Line, the telephone number for which was provided in the SPD.

While this argument is not without some persuasive force, it is not the court's role to resolve this issue on a motion for summary judgment. Again, viewing the evidence in the light most favorable to plaintiffs, I believe that a jury could reasonably conclude that under all the circumstances, plaintiffs' reliance on Drexel's misrepresentations was reasonable.

Defendants' assertion that the SPD was clear and accurate about these matters does find support in the record. Although plaintiffs' first cause of action alleges that "no SPD was provided to the plaintiffs which reasonably, sufficiently, accurately and comprehensively apprised the plaintiffs of their rights and obligations under the plan with respect to the loss of benefits in the event that an employee were to die before his or her retirement," Complaint ¶ 27, it does not appear that plaintiffs are alleging that the SPD and related documents provided to the Dermadys concerning retirement benefits were actually inaccurate on their face. On that score, there can be little or no dispute, for the evidence, which includes copies of the SPD and several "You & Kodak" benefits updates, shows that these documents did accurately explain what benefits would be available to the survivors of an employee who died prior to retirement. For example, the 1993 SPD stated, *inter alia,* that "the pre-retirement Survivor Income Benefit (pre-retirement SIB) will provide your surviving spouse ... with a percentage of your full retirement income benefit if you

die before you retire. The benefit ... is equal to 20 percent of your full retirement income benefit if you are under age 55, and 30 percent if you are age 55 or older." The SPD also stated that "if you should die before your effective date of retirement, no retirement income benefits will be payable to your estate or survivors." Ulterino Aff. Ex. K at 251, 254. In addition, the September 1995 "You & Kodak" benefits update states: "If you die before the later of your effective date of retirement or the date you elect to begin receiving your retirement income benefit, no retirement income benefits will be payable to your survivors or estate. However, if eligible, they might be entitled to the pre-retirement SIB, PRSB or minimum survivor income benefits." Ulterino Aff. Ex. M at 8.

Plaintiffs concede that Mr. and Mrs. Dermady did receive these documents (which plaintiffs produced during discovery), and they do not allege that Mr. or Mrs. Dermady actually read these statements prior to Mr. Dermady's death. Mrs. Dermady testified about the "You & Kodak" updates that Mr. Dermady "wouldn't have looked at any of them." Dermady Depo. at 101. As for herself, Mrs. Dermady stated that "if I was looking at a particular benefit like a vacation to find out what eligibility was for vacation, I might look through here and if I couldn't find it here, I would call Benefits." Dermady Depo. at 102. However, she did not recall whether she had read many of the documents or particular parts of them, and she stated that she "didn't make it a point of reading a lot of this information [that she] got from Kodak." Dermady Depo. at 111.

Plaintiffs' claim, then, is not that the SPD itself was inaccurate or misleading, but that it cannot shield defendants from liability for misrepresentations made with

apparent authority by their agent Drexel. In support of their claim, plaintiffs cite the Sixth Circuit's decision in *Krohn v. Huron Mem. Hosp.*, 173 F.3d 542 (1999). In *Krohn*, after the plaintiff was injured in an accident, her husband asked her employer, the defendant hospital (which was also the plan administrator), about disability benefits.. The hospital provided information about short-term disability benefits but not about long-term disability benefits. As a result, the plaintiff failed to file a timely application for long-term benefits. Reversing a grant of summary judgment for the defendant, the Sixth Circuit held that the defendant had an affirmative duty to inform the plaintiff about the availability of long-term benefits, stating, "we agree with the conclusion of our sister circuits that the 'duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'" *Id.* at 548 (quoting *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir.1993)).

In reaching that conclusion, the court also stated: "In what we perceive to be its weakest argument, Huron Memorial contends that it had already informed plaintiff of the availability of long-term disability benefits by providing her with a summary plan description, an employee handbook, and an individual meeting with [a personnel assistant], who explained the long-term disability plan." *Id.* at 550. Although recognizing that "an ERISA plan fiduciary may satisfy its obligation to provide employees with a comprehensive explanation of the contents of the plan by distributing to employees an explanatory booklet which adequately explains the plan and its terms," the court stated that "ERISA additionally 'imposes a duty upon fiduciaries to respond promptly and adequately to

employee-initiated inquiries regarding the plan or any of its terms.'" *Id.* (quoting *Electro–Mechanical Corp. v. Ogan*, 9 F.3d 445, 451 (6th Cir.1993)). The court therefore held that

> Providing a summary plan description several years before the request for information does not excuse the hospital from its duty to respond fully and accurately to later inquiries regarding benefits. Indeed, it would have been preferable for Huron Memorial to refer the plaintiff to her summary plan description or employee handbook to find the answer to her questions, and to have given her an additional copy if she had lost her own, than to have undertaken to provide such information and to have done so in such a careless and incomplete manner. Instead, Huron Memorial did not mention to plaintiff or her husband that a thorough explanation of benefits could be found in those documents, even though her husband's questions revealed his, and perhaps the plaintiff's, lack of awareness of where to find Krohn's benefit information. Accordingly, we reject Huron Memorial's argument that provision of a summary plan description discharged or fulfilled its obligation to provide complete material information upon plaintiff's inquiry.

*Id.*

The Third Circuit has also addressed the question of to what extent an employer can avoid liability for alleged misrepresentations by providing its employees with an accurate SPD, in *In re Unisys Corp.*, 57 F.3d 1255 (3d Cir.1995) (*"Unisys I"*), and again very recently in *In re Unisys Corp.* (*"Unisys II"*), 242 F.3d 497 (3d Cir.2001). In those cases, the defendant employer/plan administrator, asserting a reservation-of-rights clause contained both in its medical benefits plan and in the SPD, had terminated its post-retirement medical

plans for retirees and disabled former employees. The plaintiffs, a group of retirees, then brought a class action, seeking post-retirement medical benefits. One of the plaintiffs' claims was for breach of fiduciary duty, alleging misrepresentations by the defendant based on evidence that the defendant had previously assured employees that once they retired, their medical benefits would "be continued for the rest of your life." *Unisys I*, 57 F.3d at 1257.

The *Unisys* cases have a tortuous procedural history, which need not be set out in full here. In short, however, the court in *Unisys I* (an interlocutory appeal) held that the fiduciary duty claim could go forward, notwithstanding the SPD's explanation that the plan was subject to change, based on evidence that representatives of the defendant had affirmatively represented to the plaintiffs that their medical benefits were guaranteed once they retired, and failed to advise them of the reservation-of-rights clause. *Id.* at 1266–67.

In *Unisys II,* an appeal from a decision granting partial summary judgment for the defendant against all plaintiffs who would not be able to prove that the defendant's alleged breach of fiduciary duty led them to retire earlier than they otherwise would have (*e.g.,* retirees who did not voluntarily retire), the Court of Appeals, addressing the district court's characterization of *Unisys I* as allowing a narrow category of "unreasonable reliance," described that characterization as "inappropriate." Rather, the court stated, in *Unisys I,*

> We did not ... hold that the existence of the SPD was irrelevant to the analysis of the breach of fiduciary duty claims. An employer, even when acting in a fiduciary capacity, is not responsible for harm that is not reasonably foreseeable. As we pointed out in our prior

opinion in this case ..., in order for relief to be afforded, the conduct of the fiduciary must be such as to create a "substantial likelihood that it would mislead a reasonable employee in making [a decision to change his or her position]." Any determination of whether Unisys conveyed a message that was "materially misleading" in this sense cannot simply ignore the existence of the SPD. Rather, what we held on this score in *Unisys [I]* was as follows: (1) that the SPD did not as a matter of law satisfy Unisys' fiduciary responsibility; and (2) that there was evidence from which a trier of fact could conclude that Unisys should have foreseen that its conduct with respect to at least some of the class would cause reasonable employees to rely to their detriment, despite the existence of the SPD. Whether that is the case depends, of course, on the content of the message conveyed and the context in which it was conveyed.

242 F.3d at 508 (quoting *Unisys I*, 57 F.3d at 1264).

Based on the considerations expressed in these cases, I find that on the evidence presented, defendants' providing plaintiffs with the SPD and other documents explaining the prerequisites for obtaining retirement benefits does not necessarily insulate them from liability for breach of fiduciary duty based on Drexel's alleged misrepresentations. Although the documents may have been perfectly accurate and informative, they cannot be looked at in a vacuum. Balanced against those documents is the system set up by defendants for dealing with employees on disability leave. As well-intentioned as that system may have been, there is evidence that it led plaintiffs to look almost exclusively to their Disability Coordinator for advice, and to take her at her word when she gave such advice or information. *See Bower-*

**194**

man v. Wal–Mart Stores, Inc., 226 F.3d 574, 589 (7th Cir.2000) (noting that "the Plan documents do not state that this toll-free number [for inquiries concerning the plan] ought to be the sole source of information"). Drawing all permissible inferences in plaintiffs' favor, I cannot say that no rational jury could conclude that it was foreseeable here that plaintiffs would rely on Drexel's advice in these matters, or that they acted reasonably in doing so.

Defendants are also correct that the SPD and other written materials given to the Dermadys provided the telephone number for the Benefits Information Line. See Ulterino Aff. Exs. L, N. For that matter, Mrs. Dermady herself testified that she had been familiar with the number for years, and that she had called it in the past to obtain various benefits-related information. See Dermady Depo. at 115–16.

Based on the evidence concerning Drexel's statements about being plaintiffs' "sole point of contact," however, together with her alleged statement that the DMO was part of the Benefits Department, and all the other surrounding circumstances, I am also not prepared to say as a matter of law that it was unreasonable for Mrs. Dermady, in reliance on Drexel's statements, not to have called the Benefits Information Line for further information about retirement benefits. Although Mrs. Dermady was aware of the telephone number for the Benefits Information Line, the evidence does not compel the conclusion that she was ever told that that number was to be her exclusive source of information in any way related to benefits, whereas Drexel's statements arguably suggested that Drexel was, for the time being at least, the Dermadys' exclusive source of information in any way related to Mr. Dermady's disability leave.

I am also not persuaded that the Seventh Circuit's decision in Frahm v. Equitable Life Assurance Soc'y of the United States, 137 F.3d 955 (7th Cir.), cert. denied, 525 U.S. 817, 119 S.Ct. 55, 142 L.Ed.2d 43 (1998), relied upon by defendants, is inconsistent with the court's ruling in the case at bar. Frahm involved various communications, both written and oral, about the future of certain benefits. Those communications, though "technically accurate," were "potentially misleading to someone who had a decision to make," id. at 959, because they did not expressly state that the benefits would never be reduced or otherwise modified. Although the court did reject the plaintiffs' claims of reliance in part because "[b]oth the plan and the summary plan descriptions accurately told the plaintiffs that the Equitable had retained the right to change or even discontinue the medical-care plan ...," id. at 961, Frahm simply did not involve the kind of factual situation here, in which a trier of fact could reasonably conclude that a representative of defendants, acting with apparent authority to speak on their behalf, in response to a direct inquiry from a Plan beneficiary, expressly advised her that she need do nothing in order to secure certain benefits, when in fact that was simply not true. In contrast, the court in Frahm observed that in that case, "[s]ome benefits counselors may have had trouble distinguishing statements" made by the head of the defendant's benefits department about the defendant's then-current intention (to treat a certain class of employees more favorably than required by the plan) from statements about the contents of the plan, which mandated no such treatment. Likewise, the court said, "[s]ome readers must have mentally added the word 'unreduced' after a word such as 'lifetime.'" Id. at 959. That is not the situation here, where, if the record is viewed in plaintiffs' favor, Mrs. Dermady

was affirmatively, if unintentionally, misled, to plaintiffs' detriment.

## B. Failure to Provide Summary Plan Description as Required by 29 U.S.C. § 1022

■ As stated, plaintiff's first cause of action alleges that defendants have violated 29 U.S.C. § 1022[5] in that "no SPD was provided to the plaintiffs which reasonably, sufficiently, accurately and comprehensively apprised the plaintiffs of their rights and obligations under the plan with respect to the loss of benefits in the event that an employee were to die before his or her retirement," and that as a result, plaintiffs "were not able to make fully informed and timely decisions with respect to retirement benefit options, and the Plaintiffs lost substantial retirement bene-

fits." Complaint ¶ 27. As explained in the preceding discussion of plaintiffs' claim for breach of fiduciary duty, however, I find that as a matter of law, defendants did provide plaintiffs with an adequate SPD insofar as the benefits at issue are concerned. Accordingly, defendants' motion for summary judgment on plaintiffs' first cause of action is granted.

## C. Eastman Kodak as Proper Party

■ Defendants also assert that the claims against Kodak must be dismissed because Kodak is not a proper party to this action. I agree. Plaintiffs' claim is for breach of fiduciary duty, which can only be brought against a plan fiduciary. *See Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 233–35 (3d Cir.1994); *Wojciechowski v. Metropolitan Life Ins.*

---

5. § 1022. Summary plan description

(a) A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title. The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title.

(b) The summary plan description shall contain the following information: The name and type of administration of the plan; in the case of a group health plan (as defined in section 1191b(a)(1) of this title), whether a health insurance issuer (as defined in section 1191b(b)(2) of this title) is responsible for the financing or administration (including payment of claims) of the plan and (if so) the name and address of such issuer; the name and address of the person designated as agent

for the service of legal process, if such person is not the administrator; the name and address of the administrator; names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator); a description of the relevant provisions of any applicable collective bargaining agreement; the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this chapter and the Health Insurance Portability and Accountability Act of 1996 with respect to health benefits that are offered through a group health plan (as defined in section 1191b(a)(1) of this title) and the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 1133 of this title).

**196**

*Co.,* 75 F.Supp.2d 256, 261 (S.D.N.Y.1999), *aff'd,* 242 F.3d 368 (table) (2d Cir.2001).

Plaintiffs have not responded to this argument, nor have they presented any evidence that Kodak is a named fiduciary of the Plan, or that Kodak has any discretionary authority with respect to the administration of the Plan, or control of its assets. *See* 29 U.S.C. § 1002(21)(A). All of plaintiffs' claims against Kodak are therefore dismissed.

## CONCLUSION

Defendants' motion for summary judgment (Docket Item 14) is granted in part and denied in part. Defendants' motion is granted as to plaintiffs' first cause of action, and as to all of plaintiffs' claims against defendant Eastman Kodak Company. In all other respects, defendants' motion is denied.

IT IS SO ORDERED.