IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MIDWEST RENEWABLE ENERGY V. B4 GRAIN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MIDWEST RENEWABLE ENERGY, L.L.C., APPELLANT AND CROSS-APPELLEE,

V.

B4 GRAIN, INC., AND B4 AND AFTER, INC., APPELLEES AND CROSS-APPELLANTS,
AND THE ANDERSONS, INC., APPELLEES.

Filed April 13, 2021.    No. A-20-245.

Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed.

Bradley D. Holbrook and Elizabeth J. Klingelhoefer, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellant.

Victor E. Covalt III, of Covalt Law Firm, and Adam R. Little, of Ballew Hazen, P.C., L.L.O., for appellees B4 Grain, Inc., and B4 and After, Inc.

Trev E. Peterson and Carly L. Bahramzad, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., for appellees The Andersons, Inc.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Midwest Renewable Energy, L.L.C. (MRE), filed suit in the district court for Buffalo County against defendants B4 Grain, Inc.; B4 and After, Inc.; and The Andersons, Inc. (Andersons). The court entered judgment in favor of the defendants on MRE's causes of action for breach of contract and subsequently denied MRE's motion for new trial or, in the alternative, to alter or amend the judgment. MRE appeals, and B4 Grain and B4 and After cross-appeal. For the reasons set forth herein, we affirm.

- 1 -

## II. BACKGROUND

### 1. PARTIES

MRE is a Nebraska limited liability company. MRE owns and operates an ethanol plant in Sutherland, Nebraska, and manufactures ethanol and related byproducts using grain.

Prior to December 31, 2010, B4 Grain was in the business of buying and selling grain with its principal place of business in Kearney, Nebraska. B4 Grain supplied corn to MRE's ethanol plant under a series of processing agreements. B4 Grain sold substantially all of its assets to Andersons. Thereafter, B4 Grain formed a new corporation, B4 and After. We refer to these entities collectively as "B4."

Andersons is an Ohio corporation, authorized at all relevant times to do business in Nebraska, in the business of buying and selling grain. Andersons took over selling grain to MRE after its purchase of B4's assets.

The primary issue in the dispute between the parties is the meaning of "cost of corn" (or other equivalent phrase) in the various agreements of the parties. MRE contends that "cost of corn" means the actual cost of corn paid by the defendants to purchase the corn supplied to MRE. The defendants contend that "cost of corn" means the market price for corn on the day that ethanol is sold.

### 2. CONTRACTS AND RELEVANT DEALINGS

Prior to and during 2008, MRE purchased corn from B4 for the production of ethanol and byproducts at its ethanol plant in Sutherland. Much of this corn was purchased by B4 and sold to MRE at the high end of the corn market in 2008 ($7 plus per bushel). During 2008, MRE signed contracts with B4 to purchase and take future delivery of millions of bushels of corn from B4. In order to assure its ability to deliver corn to MRE as contracted, B4 purchased futures contracts on the commodity exchange to offset its commitments to MRE (collectively referred to as "the higher priced contracts"). Shortly after, corn prices dropped drastically (to $3.80 per bushel). As a result, MRE was unable to produce and sell its products under the original contract prices and B4 was obligated, under its futures positions, to buy grain which MRE could not take.

In October or November 2008, MRE shut down its plant for approximately 6 weeks due to lack of operating capital and advised B4 that it was unable to take delivery and pay for corn under the higher priced contracts. In November or December, B4 and MRE negotiated an arrangement whereby B4 would again provide corn to MRE for processing into ethanol and byproducts. This allowed MRE to resume ethanol production, thus allowing it to fulfill its obligations to B4 and other creditors. As part of the arrangement, MRE was to satisfy its obligations on the higher priced contracts by paying for corn priced in accordance with one of the higher priced contracts, first at 20,000 bushels a month and later at 5,000 bushels a week. This payment was incorporated into a calculation of the net processing fee B4 would pay MRE for the production of ethanol and byproducts. To avoid attachment by MRE's other creditors, B4 retained title to all grain delivered to MRE. B4 also retained title to ethanol and byproducts produced using the grain. B4 agreed to pay MRE a weekly processing fee based upon the gross proceeds of the sale of ethanol and related byproducts, less the "cost of corn" and direct expenses incurred. Under the arrangement, MRE

could satisfy its obligations by applying an amount of bushels per month towards the higher priced contracts until its obligations were either paid off, bought back by B4, or canceled. Any remaining profit was to be split equally between MRE and B4.

The weekly processing fee payments reflected estimates of the amount due for the prior week's production. B4 provided weekly emails to MRE showing how the payments were computed, including the corn prices used in the week's calculation. B4 would also occasionally advance funds in excess of production to help MRE meet its obligations. B4 then sent monthly "true-ups" to reconcile the weekly estimated payments and advances with the actual results of ongoing production, sales, and corn used to determine processing fees. The true-ups were presented in the form of a cumulative spreadsheet, showing corn purchased and used, commissions and revenues from the sale of ethanol and byproducts, payments made to MRE, production fee earned, and grain in storage and in process, among other things. Although the spreadsheet includes price data, it does not specify the point in time represented by that data (i.e., price of corn at time of purchase versus when ethanol was sold).

The initial arrangement under which B4 and MRE operated between December 2008 and May 2009 appears to have been primarily oral and very similar to the written processing agreements entered into thereafter. While there is some testimony in the record suggesting that there may have been written versions of the arrangement, or some portion of the arrangement, for the period prior to May 2009, no such written agreements were produced at trial. The only written agreements between B4 and MRE in the record (prior to the relationship with Andersons) are the processing agreements effective from May 29 through September 20, 2009 (when it was to be reviewed); April 1, 2010 (to be reviewed on June 30); and from June 1 through December 31 (when it was to be reviewed). None of these written agreements define the "cost of corn."

From December 8, 2008 through the end of 2010, B4 supplied corn to MRE for processing into ethanol and byproducts. From approximately December 12, 2008, through December 29, 2010, B4 made payment to MRE for processing corn into ethanol and byproducts on a weekly basis and MRE accepted and retained the payments. The last regular payment by B4 to MRE was on December 29. A cumulative report of the monthly "true-ups" between B4 and MRE dated December 31, 2010 was received in evidence, along with the emails from B4 to MRE which calculated the weekly payments and showed the corn prices used in the week's calculations. After B4 sold to Andersons, B4's general manager Eric Bruggeman went to work for Andersons as its merchandising manager and continued to provide MRE with a monthly true-up through July 2011.

Effective January 1, 2011, Andersons purchased substantially all of B4's assets, and B4 ceased conducting the business of buying and selling grain in its own name. Andersons did not purchase MRE's obligation to B4 under the higher priced contracts. Andersons, MRE, and B4 executed a tolling agreement, effective January 1 through March 31 (the tolling agreement), under which Andersons agreed to continue B4's business of providing corn purchased on B4's future contracts with MRE and otherwise for the production and sale of ethanol, reimbursing B4 on MRE's obligations under the higher priced contracts. The tolling agreement was extended April 1 through June 30, July 1 through September 30, and October 1 through December 31; none of the tolling agreements defined the cost of corn. Through the tolling agreement, B4 cancelled one of the higher priced contracts by buying back 200,000 bushels of corn on its books and applied the

proceeds to partially satisfy MRE's liability on one or more of the remaining higher priced contracts. B4 set up a "receivable" due to B4 from MRE for the balance.

After executing the tolling agreement, Andersons supplied the corn and made payments to MRE under the agreement. B4 was not obligated to supply or deliver grain to MRE and did not make any payments to MRE directly after December 2010. The first payment by Andersons under the tolling agreement was on January 5, 2011. B4 was a party to the tolling agreement only because MRE was still under contract to pay B4 under the higher priced contracts (which the record indicates were paid off around April 2011) and B4 was entitled to receive payment from Andersons under the tolling agreement to reduce MRE's obligations under the higher priced contracts. The tolling agreement required MRE to make production reports to both Andersons and B4.

### 3. EVIDENCE REGARDING "COST OF CORN"

A significant amount of evidence was adduced regarding the parties' differing interpretation of the term "cost of corn" in the parties' arrangement and processing agreements.

James Jandrain, chairman of MRE's board, testified about the discussions with B4 in late 2008 leading to the agreements at issue here. He testified that general discussions in the first meeting with B4 included the concept that "the first thing that would be paid is [B4's] cost of corn so they didn't lose that money." When asked if he told anyone at the first meeting "the cost of corn meant whatever the market value was when the ethanol would be sold," he replied, "No." He was also asked if he told anyone what he understood by the term "cost of corn," and he responded, "No. Cost is cost."

The details of the party's arrangement were negotiated primarily by Jandrain and Bruggeman, although Jandrain testified that he also sought input from MRE's general manager and communicated with MRE's board. He was asked if a definition of "cost of corn" was discussed in any of the communications with Bruggeman. Jandrain did not remember any such discussion, stating again that "it was cost" and that the matter was not discussed. He testified that it was important to him that the calculations under the agreement be based on B4's actual cost to buy corn because MRE believed that B4 could purchase corn cheaper and more efficiently than MRE could. Jandrain testified that although MRE had suspicions B4 was using a "cost of corn" that was higher than its actual price paid to acquire the corn, he did not really know that to be the case until a final true-up was provided to MRE in April 2012.

Jandrain was asked what "market value" meant to him "as an ethanol processor," and he stated that it would be "the cost in a given market at a given time to acquire something." He was asked about the relationship between "market value" and "cost," and at the end of that portion of his testimony, he agreed that "market value" could be either higher or lower than "the true cost to buy something."

Bruggeman did not specifically recall telling anyone from MRE when negotiating the parties' arrangement what he believed the definition of "cost of corn" to be, although he testified, "I am sure that we did." He went on to testify that "in our business" when talking about contracting corn, "We don't . . . really say, cost. We always talk about the market." However, he did not specifically remember if he said "the market or the cost," and he did not recall anyone from MRE telling him what they thought "cost of corn" meant. When asked to explain why the term "cost of

- 4 -

corn" was used in the processing agreement, Bruggeman testified, "Because really you can say the cost is the market for the corn for this agreement." He also stated that "cost" and "market" can be, but are not always "the same thing."

Early on in the operation of the processing agreements, MRE grew suspicious of the cost of corn used to calculate the estimates and "true-ups" believing it was greater than B4's actual cost. In April 2009, MRE investigated and determined that B4 appeared to be using a value for cost of corn that was "too high" in comparison to what "other feeders" and "other ethanol plants" were paying for corn. The minutes from MRE's board meeting on April 9 reflect that MRE's general manager, Troy Gavin, had asked Bruggeman, "to prepare a report explaining their corn pricing strategies to be presented to the board sometime around the first of the month." The minutes also state that "B4 appears to simply be simultaneously selling ethanol and pricing corn." According to witnesses for MRE, MRE communicated to B4 its concerns regarding the value B4 was using for "cost of corn" in calculating payments, and MRE made multiple requests for documentation to substantiate both the "cost of corn" being used by B4 in its calculations, as well as records to substantiate the actual cost B4 paid for the corn. However, B4 does not appear to have been responsive to these inquiries. Trial testimony from witnesses for B4 indicates that although B4 had access to its actual cost information, it did not provide documents to substantiate its actual purchase costs to MRE when requested. The emails from B4 to MRE which accompanied the weekly true-ups provided the price for the corn; however, the emails did not indicate whether the corn was priced at the time it was purchased by B4 or at the time the ethanol produced from that corn was sold.

At trial, MRE's expert witness, George Bayer, was asked what the phrase "cost of corn, cost of grain" meant to him as a certified public accountant. He testified that to him it meant "the price that someone is going to pay for grain FOB [free on board] their place of business." There was also testimony from Andersons' expert witness, Carey Williams, who had reviewed the tolling agreements. He was asked, as someone involved in the grain business, whether the terms "corn price" and "cost of corn" meant "anything different than market price at the time of the transaction." He replied, "It would just be market. I mean, again, it would be at the time of the agreed upon decision to . . . price the grain, whatever that time was, that would be the price, that would be the cost, that would be the market at that time."

### 4. FINAL DEALINGS AND RELATED DISPUTES

#### (a) April 2012 Final Meeting

Andersons' last delivery of corn to MRE was in February 2012 and the last payment to MRE by Andersons was made in April under the "final true-up," which MRE claims was just a compilation of the previous monthly "true-ups." The final "true-up" showed Andersons only owed MRE $22,775. MRE believed the actual amount should have been $676,205, and Andersons' internal correspondence suggested the number should have been closer to $225,000 or $300,000. Andersons paid $22,775 to MRE. B4 was not involved in the final accounting and settlement between Andersons and MRE.

Various witnesses testified at trial about the April 2012 final true-up meeting between representatives of MRE and Andersons. Jamie Saldana, Anderson's finance director, testified that

the final true-up spreadsheet was sent to Penny Thelen, the controller/bookkeeper for MRE, prior to the meeting. According to Saldana, she and another representative of Andersons (not Bruggeman) met with Jandrain and Thelen for MRE to discuss the spreadsheet, which shows a final amount due to MRE of $22,775.22. According to Saldana, neither Jandrain nor Thelen raised any objection to the numbers shown on the spreadsheet, and upon leaving the meeting, she thought the matter was resolved. As noted above, this final spreadsheet was a continuation of the spreadsheet begun by Bruggeman when B4 was providing corn to MRE. The record shows that the last "wire transfer" of $22,775.22 was deposited in MRE's account on April 24, 2012. Saldana testified that Andersons "sent [MRE] support for every wire" and that she believed the "support" sent for the $22,775.22 payment said "final payment" on it. However, Saldana did not have a copy of any such supporting documentation with her at the time of her trial testimony.

Jandrain also testified about his recollection of the April 2012 meeting. Jandrain confirmed that he received the final true-up spreadsheet at the meeting. He denied that MRE received "any of the supporting documents to prove up the numbers in [the spreadsheet]," at least with respect to "the corn." He testified that although supporting documents for the cost of corn were requested, none were provided at the meeting. Jandrain testified further, "And I'm . . . not sure what was on that spreadsheet; but I asked [Thelen and Tom Wilson] to go into the spreadsheet and see what the detail was, and it just was not -- we needed the corn purchase agreements and they were not there."

In contrast with the other witnesses, Thelen recalled two separate final true-up meetings. She testified that two women from Andersons came to MRE's office in April 2012 for the first meeting and that the final spreadsheet was not provided at that meeting. She indicated that at the first meeting, one of Andersons' representatives asked how much Thelen thought was due to MRE, to which Thelen replied, "750 or seven hundred and some thousand dollars." According to Thelen, the Andersons representative responded "that's amazing, that's about what I came up with." Thelen was unable to recall the name of the individual who made this comment. Thelen testified that after the first meeting, a second meeting occurred in the latter part of April or May. Thelen identified the Andersons representatives at this second meeting as Saldana and "Dawn" (same first name as the representative identified by Saldana in her testimony). Thelen thought she did not receive the final true-up spreadsheet until after the meeting with Saldana. She did not recall personally contacting or being contacted by anyone from Andersons to discuss the spreadsheet after she received it. Thelen was asked whether after receiving the spreadsheet, she had any opportunity to question anyone at B4 or Andersons about how they calculated the $22,775.22. She did not recall whether she "emailed [Bruggeman] back after receiving [the spreadsheet]," testifying that she thought she "just talked to [Jandrain and Gavin] about it." She admitted that MRE received the $22,775.22 and that MRE did not "send it back." Thelen testified, however, that the payment of $22,775.22 was sent "[i]n accordance with their true-up, not our true-up." She also affirmed that she felt "more monies were due and owing MRE than 22,000." Thelen was asked whether there was "any communication or any representation that that was the final payment due and owing to MRE by anybody," and she indicated that there was not. Then she was asked more specifically whether there was any communication from B4 to MRE saying "this is all we owe you." Thelen testified, "When they sent me the spreadsheet, they said that this is our final reconciliation," and indicated that she expressed her surprise at the final number shown. Upon further questioning,

Thelen indicated that it was either Saldana or Bruggeman who expressed "that's our final reconciliation." She also indicated that she understood the final amount shown was intended to represent everything owed by both B4 and Andersons "all together."

### (b) Dispute With Respect to Ethanol Purchased by B4

Since the April 2012 meeting, MRE claims to have identified certain discrepancies in the final true-up spreadsheet, one of which relates to ethanol purchased from MRE by B4 in 2010 when MRE needed extra cash, and B4 agreed to purchase "boot" (ethanol in bottom of tanks) for $52,846.50. That figure was carried as a credit. MRE claims that in the final accounting, that figure was erroneously included as a deduction, rather than a credit for amounts owed to MRE. Anderson's position is that this amount was included in a payment of $212,046.50 wired to MRE's account on May 7, 2010.

At trial, Bruggeman was asked about a May 8, 2010, entry of $52,846.50 that appears on both the December 2010 true-up and the final true-up, along with the notation "Ethanol Gallons Purchased From MRE (35,231 gal × $1.50 = $52,846.50)." Bruggeman testified that he placed the entry on the spreadsheet to remind himself that B4 owned that ethanol, and to make an appropriate adjustment in any final true-up. He acknowledged that the notation was confusing and may have caused some of "these issues."

After the lawsuit was filed, Saldana was asked to review the final true-up spreadsheet. She testified that it was after this review that she noted the error regarding the $52,846.50 ethanol purchase entry. She testified that in doing "the reconciliation for the true-up," she was trying to correct the entry and subtracted the entry from the cost of corn when she should not have adjusted the corn number. She testified that the error was inadvertent and had she caught it previously, she would have added the $52,846.50 to the $22,775.22 that was paid after the true-up meeting. Saldana testified that she did not find any other errors during her review of the final true-up spreadsheet.

### (c) Dispute With Respect to Corn Removed by Andersons

Another dispute concerns Andersons' alleged failure to subtract 195,000 bushels from the final true-up, which MRE claims shorted it about $1.7 million. According to Wilson, MRE's general manager at the time of his testimony, this 195,000 bushels was unprocessed corn owned by Andersons, which was still on site at MRE's facility and was then removed from the facility by Andersons with MRE's assistance, but which had already been included in calculating the processing fee owed to MRE. In reaching this conclusion, Wilson compiled and examined figures for the total amount of grain delivered the MRE's facility and the amount of grain withdrawn from the facility by Andersons. Specifically, he prepared a summation of MRE's "scale tickets" between February 28 and March 30, 2012, and he determined that the total amount of bushels that were shipped out of the plant at the "termination of the Anderson contract" was 195,091.31. He indicated that his review of the final true-up spreadsheet led him to believe that MRE was charged for the processing of the 195,000 bushels that were removed from the facility prior to being processed. After explaining his calculations further, Wilson concluded that Andersons should have but did not subtract the 195,000 bushels from the final true-up, shorting MRE at least $1,699,174.

## 5. PLEADINGS

On December 31, 2015, MRE filed a complaint against B4 and Andersons. MRE outlined the history of the parties' agreements and operations under those agreements. MRE then asserted that Andersons supplied it with a "purported reconciliation covering the entire period" during which the defendants had supplied corn to MRE in March 2012, after which time MRE first suspected that the defendants had not been using their own costs of acquiring corn in calculating the weekly payments to MRE and in the reconciliation. In its first and second claims for breach of contract, MRE alleged that B4 and Andersons, respectively, breached the processing agreements and the tolling agreement by failing to provide MRE with a true and correct accounting, failing to remit to MRE the correct amount due and owing under the agreements, and overcharging MRE for the corn supplied to it. MRE alleged that these were material breaches, a proximate cause of damages to it, and that the amount of these damages currently could not be determined. MRE also set forth claims for fraudulent concealment and conspiracy, which were dismissed with prejudice upon the parties' stipulation prior to trial.

In its answer, B4 raised several affirmative defenses and pled a counterclaim. B4 denied that it owed any duties to MRE under the tolling agreement and that it fully performed all the obligations under the processing agreements, which performance was accepted and ratified by MRE. B4 asserted that any obligations it had to MRE had been paid and satisfied in full and, among other things, that by its conduct, MRE waived its claims, that MRE was equitably estopped from asserting any claims against B4, and that any claims against B4 were barred by the applicable statute of limitations (SOL). B4 asserted a counterclaim on an account stated for $559,000 plus prejudgment interests, or alternatively, sought credit as a recoupment. It alleged that despite demand, MRE had refused to pay. In its reply, MRE asserted various defenses against the counterclaim, including an SOL defense.

Andersons also raised affirmative defenses in its answer. It alleged that its obligations to MRE arose only under the tolling agreement, that it fully performed all of its obligations under the tolling agreement, and that it presented a "reconciliation" to MRE in April 2012. Andersons alleged the reconciliation was accepted by MRE and that Andersons' "Final Payment" of $22,775.22 was made to MRE, as an accord and satisfaction. Andersons also alleged that MRE's claim against Andersons was barred by the applicable SOL. In its reply to Andersons, MRE denied the affirmative defense of accord and satisfaction, alleging that there was no meeting of the minds with respect to "the final true up" and that there was no indication that "the final payment was made as a payment in full" or any other indication that it was meant to be "a final payment for all matters under the towing [sic] agreement."

## 6. SUMMARY JUDGMENT PROCEEDINGS

The district court denied summary judgment motions filed by the defendants. B4 sought summary judgment based on an SOL defense. In overruling that motion, the court considered whether MRE's claims against B4 were barred by the 5-year SOL for actions on written contracts found in Neb. Rev. Stat. § 25-205 (Reissue 2016). Specifically, the court considered B4's argument that the accrual dates for MRE's claims against it were "the dates on which B4 and Andersons were committed to remit payment to MRE for weekly processing agreements." The court noted

that the agreements stated that the fee was to be paid "on Wednesday of the following week for the prior processing week." The court then stated that under § 25-205, all claims of MRE against B4 would be barred as MRE's cause of action for each individual underpayment would have accrued more than 5 years before MRE filed its complaint asserting breach of contract on December 31, 2015 (with the possible exception of the last payment which MRE asserted was made by Andersons in January 2011).

The district court went on to note that B4's argument ignored the practice by B4 and Andersons, notwithstanding the wording of the agreements, of paying an estimate of the processing fee in advance in round numbers and then through accounting practices to "true-up" the amounts actually calculated as due at the end of each month. The court stated, "This practice appears to suggest a mutual or open accounts system or more likely ongoing joint venture arrangement in which the processing fee for MRE's services in producing ethanol (actually a determination of MRE's share of profits from the sale of the ethanol produced) was continuously calculated and adjusted over the entire course of a joint venture." The court noted that while MRE did not specifically plead for an accounting on an "open account" or "joint venture" theory, its allegations of breach of contract included an assertion that B4 failed to provide MRE with a true and correct accounting. The court reasoned that an accounting action on an open account or joint venture theory "gives rise to an argument that B4 and Andersons constituted one continuous entity or were alter egos of the other." The court concluded that any joint venture by the parties arguably terminated December 31, 2011, at the end of the last tolling agreement extension. Accordingly, the court found an issue of fact as to "whether this date sets the true accrual date of MRE's claim for accounting or breach."

Finally, the district court concluded by stating:

In summary, it would appear that there are genuine issues of material fact as to whether the parties had a true meeting of minds on a critical element of their ongoing agreements, the true nature of the parties' agreements, considering not only the language of the written parts of those agreements and how the parties characterize their agreements but also the parties['] practice in continuing an ongoing business arrangement in which both MRE on one side and B4 and The Andersons should have recognized that, at some point in the future, an essential element of their agreement[,] i.e.[,] the consideration to be paid for MRE's processing of ethanol (or how to calculate its fair share of ethanol sales), would have to be resolved. At the very least, an issue of fact exists as to whether, given the parties['] actual practices, their transactions were mutual or reciprocal open accounts or a joint venture based in part on a series of partially oral but largely written contracts. The court must find that the accrual date for any limitations period is itself an issue of fact and B4's Motion for Summary Judgment must be denied.

The district court also found material issues of fact and denied Andersons' motion for summary judgment on MRE's claims on the basis of other affirmative defenses and a separate motion for summary judgment by B4 based on its counterclaim.

## 7. TRIAL

Trial was held before the district court on September 11-13, 2019, and was tried before a different district court judge than presided over the summary judgment proceeding. The record is voluminous, and we have summarized the relevant facts about the parties and their dealings above. Additional facts as necessary to the resolution of this appeal will be set forth in the analysis below.

At the close of trial, MRE moved to amend its complaint to conform to the evidence adduced at trial. It sought to add allegations in its breach of contract claims against B4 and Andersons that they each breached the implied covenant of good faith and fair dealing in the processing agreements and/or the tolling agreements in determining the "cost of corn." They also sought to add claims for breach of fiduciary duty-accounting against both defendants based on allegations of a joint venture between MRE and B4, a breach of fiduciary duty by B4 in calculating the processing fee owed to MRE, and by the defendants' concerted actions in "self-dealing for the joint benefit of each of them" with respect to the payments made to MRE.

## 8. JUDGMENT

On January 15, 2020, the district court entered judgment in favor of B4 and Andersons on each of MRE's claims and in favor of MRE on B4's counterclaim. The court examined the processing agreements and tolling agreements and found that the agreements failed to define an essential contract term, the "cost of corn," which was necessary to calculate the processing fee to be paid to MRE, and the court concluded that the processing and tolling agreements must be treated as oral contracts.

Next, the district court considered B4's SOL defense to MRE's claims. Based on its conclusion that the agreements must be treated as oral contacts, thus subject to a 4-year SOL under Neb. Rev. Stat. § 25-206 (Reissue 2016), the court concluded that the breach of contract claims against B4 were barred unless MRE established a joint venture between the defendants; however, the court was unable to find clear and convincing evidence of a joint enterprise either between B4 and MRE or between B4 and Andersons. The court also found MRE's claims against B4 were barred by the SOL for an open account under Neb. Rev. Stat. § 25-216 (Reissue 2016).

The district court concluded that MRE's claims against Andersons were not barred by the SOL in § 25-206; however, the court found that MRE had not met its burden of proving that Andersons (or its predecessor B4) was contractually obligated to calculate the processing fee payments based upon the cost that the defendants paid for the corn supplied to MRE. Accordingly, the court concluded that MRE could not meet its burden to prove a breach of contract or any damages.

Finally, the district court denied MRE's motion to amend its complaint. It also determined B4's counterclaim against MRE was barred by the SOL for written contracts under § 25-205.

## 9. MOTION FOR NEW TRIAL

MRE filed a motion for new trial or, in the alternative, to alter or amend the judgment. In its motion, MRE claimed (1) a failure to give it a credit of $52,846.50 for the purchase of ethanol by B4 from MRE, (2) a failure to account for 195,000 bushels charged as corn processed but removed from the ethanol facility and never processed, and (3) applying the wrong burden of proof

as to the issue of a joint venture. The district court denied the motion, finding that any credit for ethanol purchased by B4 from MRE and the claim against Andersons for removal of grain, for which MRE claims to have been "charged," were barred by Andersons' accord and satisfaction defense. The court noted that it had previously applied a clear and convincing standard of proof regarding the existence of a joint venture; it concluded that the evidence was also insufficient to establish a joint venture under a preponderance of the evidence standard.

## III. ASSIGNMENTS OF ERROR

MRE asserts, reordered, that the district court erred in (1) finding it failed to meet its burden of proving all essential contract terms, (2) failing to find that Andersons breached the implied covenant of good faith and fair dealing, (3) failing to grant it leave to file an amended complaint, (4) finding that the doctrine of accord and satisfaction discharged certain of MRE's claims, (5) finding that its claims against B4 are barred by the SOL, and (6) finding no evidence of a joint venture.

B4 attempts to raise a cross-appeal, asserting that the district court erred in (1) finding that the account stated should be treated as an oral contract because it did not include a payment term and thus finding that B4's counterclaim was barred by the applicable SOL, and (2) finding that the last acknowledgement of liability by MRE occurred on July 1, 2011. As a threshold matter, an appellate court must determine what assignments of error were properly raised and argued on appeal. *Krejci v. Krejci*, 304 Neb. 302, 934 N.W.2d 179 (2019). Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2014) provides:

> Where the brief of appellee presents a cross-appeal, it shall be noted on the cover of the brief and it shall be set forth in a separate division of the brief. This division shall be headed 'Brief on Cross-Appeal' and shall be prepared in the same manner and under the same rules as the brief of appellant.

See, also, *Krejci v. Krejci, supra*. Thus, the cross-appeal section of an appellate brief must set forth a separate title page, a table of contents, a statement of the case, assigned errors, propositions of law, and a statement of the facts, and when a brief of an appellee fails to present a proper cross-appeal, an appellate court declines to consider its merits. *Id*. When a brief of an appellee fails to present a proper cross-appeal pursuant to § 2-109, we decline to consider its merits. See *Krejci v. Krejci, supra*.

B4's brief on cross-appeal is virtually identical in form to the brief on cross-appeal in *Krejci*. Although conforming to our rules in nearly every other way, both briefs fail to set forth a separate title page for the cross-appeal followed by a table of contents. In *Krejci*, the Nebraska Supreme Court declined to consider the merits of the cross-appeal as being noncompliant with our rules. Vertical stare decisis compels lower courts to follow strictly the decisions rendered by higher courts within the same judicial system. *State v. Barranco*, 278 Neb. 165, 769 N.W.2d 343 (2009). Accordingly, we are bound to follow *Krejci v. Krejci, supra*. Because B4 has not properly cross-appealed, we decline to address the merits of the cross-appeal.

IV. STANDARD OF REVIEW

A suit for damages arising from breach of a contract presents an action at law. *Goes v. Vogler*, 304 Neb. 848, 937 N.W.2d 190 (2020). In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony; an appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error. *Benjamin v. Bierman*, 305 Neb. 879, 943 N.W.2d 283 (2020). Similarly, the trial court's factual findings have the effect of a jury verdict, and an appellate court will not disturb those findings unless they are clearly erroneous. *State ex rel. BH Media Group v. Frakes*, 305 Neb. 780, 943 N.W.2d 231 (2020).

In reviewing a judgment awarded in a bench trial of a law action, an appellate court considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019).

The construction of a contract is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below. *Valley Boys v. American Family Ins. Co.*, 306 Neb. 928, 947 N.W.2d 856 (2020).

An appellate court reviews a district court's denial of a motion for leave to amend a complaint for an abuse of discretion. *Eagle Partners v. Rook*, 301 Neb. 947, 921 N.W.2d 98 (2018). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *George Clift Enters. v. Oshkosh Feedyard Corp.*, 306 Neb. 775, 947 N.W.2d 510 (2020).

An appellate court reviews a denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion. *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020).

V. ANALYSIS

1. PROOF OF ESSENTIAL CONTRACT TERMS

MRE asserts that the district court erred in finding it failed to meet its burden of proving all essential contract terms. It also asserts that the court erred in failing to find that Andersons breached the implied covenant of good faith and fair dealing.

After finding that MRE's claims against B4 were barred by the applicable SOL, the court addressed whether MRE proved all essential contract terms in the context of examining MRE's contract claims against Andersons. The court found that MRE had failed to prove an essential contract term, the meaning of the term "cost of corn" as used in calculating the processing fee payments made to MRE. The court stated:

> The parties disagree or at least, MRE questioned the manner in which B4 calculated the payments. MRE appears to have been aware of B4's practice since at least April 9, 2009. Minutes from a shareholder's meeting provide "While B4 appears to simply be

simultaneously selling ethanol and pricing corn, [someone at another company] said they did surprisingly well pricing the ethanol[.]" . . . The parties did not resolve this disagreement. [MRE] has not met its burden of proof that . . . Andersons (or [its] predecessor B4) was contractually obligated to calculate the processing payments based upon the cost that the [d]efendant[s] paid for the corn supplied to MRE. Obviously if [MRE] failed to prove that term, [it] cannot meet its burden to prove a breach of any damages.

A party seeking to enforce a contract has the burden of establishing the existence of a valid, legally enforceable contract. *Valley Boys v. American Family Ins. Co.*, 306 Neb. 928, 947 N.W.2d 856 (2020). To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Acklie v. Greater Omaha Packing Co.*, 306 Neb. 108, 944 N.W.2d 297 (2020). It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements. *Id.* It must identify the subject matter and spell out the essential commitments and agreements with respect thereto. *Id.*

In limited circumstances, the parties' failure to specify an essential term does not prevent the formation of a contract. *Stitch Ranch v. Double B.J. Farms*, 21 Neb. App. 328, 837 N.W.2d 870 (2013). The actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. *Id.* Sometimes, a court can ascertain the meaning of a party's promise by referring to the parties' course of dealing with each other, or a general reasonableness standard. *Id.* The circumstances must still show that the parties manifested an intent to be bound by a contract. *Id.* Their manifestations are usually too indefinite to form a contract if the essential terms are left open or are so indefinite that a court could not determine whether a breach had occurred or provide a remedy. *Id.*

The term "cost of corn" was not defined in any of the parties' agreements, and they have presented opposing definitions (actual cost paid by B4/Andersons to purchase corn supplied to MRE versus market price for corn on day that ethanol is sold). Our review of the voluminous record in this case illustrates the difficulty in defining how various witnesses understood the term, either in the agreements or in their industry in general, given that terms such as "cost," "price," and "market" can mean the same thing at a given point in time. Several witnesses' testimony illustrates, in fact, that a time component was the true missing ingredient in the processing fee formula devised by the parties. In other words, the agreements do not define at what point in time the "cost of corn" used in the calculation was to be determined. The agreements do not pinpoint whether the parties intended to use the "cost of corn" at the time B4/Andersons purchased the corn or at the time the ethanol made from that corn was sold. And, the parties' conduct and surrounding circumstances do not provide a clear path for a court to determine whether a breach had occurred or provide a remedy. MRE accepted payments and continued to process corn into ethanol, despite suspecting that B4/Andersons was using a different definition of "cost of corn" than that used by MRE, despite being provided the weekly emails showing the corn price, and despite not being provided supporting documentation from B4/Andersons regarding the price of the corn supplied.

We agree that with the district court that MRE failed to prove an essential term of the processing and tolling agreements; namely, the determination of the cost of corn supplied to MRE. The court did not err in finding that MRE failed to meet its burden of proving that B4/Andersons were contractually obligated to calculate the processing fee payments based upon the cost that B4/Andersons paid for the corn supplied to MRE.

While the district court denied MRE's motion to amend its complaint to add, among other things, allegations to its breach of contract claims that the defendants breached the implied covenant of good faith and fair dealing in the parties' agreements, we note that the implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract. *Acklie v. Greater Omaha Packing Co.*, 306 Neb. 108, 944 N.W.2d 297 (2020). However, in order for the implied covenant of good faith and fair dealing to apply, there must be in existence a legally enforceable contractual agreement. *Id.* Because we have found that the district court did not err in finding that MRE failed to establish a legally enforceable contractual agreement, it likewise did not err in denying MRE's motion to amend its complaint to add allegations regarding the breach of an implied covenant of good faith and fair dealing.

## 2. AMENDED COMPLAINT

MRE asserts that the district court erred in failing to grant it leave to file an amended complaint to add allegations regarding the existence of a joint venture. In denying the motion, the court stated that while amendments to pleadings are liberally granted under Nebraska's pleading rules, the proposed amendment made at the conclusion of the case denied the defendants a fair opportunity to litigate a new cause of action. The court noted that the parties filed a joint pretrial statement and proceeded to trial on the issues set forth therein. The court also observed that the motion was "to an extent moot," given the court's finding earlier in the January 2020 judgment that MRE had failed to prove the existence of a joint venture.

Despite denying the motion to amend the complaint, the district court nevertheless considered the evidence regarding the existence of a joint venture as it related to the SOL issue. The court found that MRE failed to prove the existence of a joint venture, and, as discussed below, we agree. Thus, it is unnecessary for us to address whether the district court abused its discretion in denying MRE's motion to amend its complaint to conform to the evidence. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020). And, as discussed above, the court did not err in denying MRE's motion to amend its complaint to add allegations regarding the breach of an implied covenant of good faith and fair dealing.

## 3. ACCORD AND SATISFACTION

MRE asserts that the district court erred in finding that the doctrine of accord and satisfaction discharged certain of MRE's claims. In its motion for new trial, MRE asserted that the January 2020 judgment was erroneous because the court did not award MRE $105,693 in damages for the accounting error relating to the failure to give a credit of $52,846.50 credit for ethanol purchased by B4 from MRE. It also asserted that the judgment was erroneous because the court

did not award MRE $1,669,174 in damages for the approximately 195,000 bushels of corn delivered to MRE's facility and charged as corn processed by MRE, but which was removed from the facility and never processed. In ruling on MRE's motion, the court determined that both of these claims were barred by Andersons' accord and satisfaction defense.

An accord and satisfaction is an agreement to discharge an existing indebtedness by rendering some performance different from that which was claimed due. *McCaulley v. Nebraska Furniture Mart*, 21 Neb. App. 125, 838 N.W.2d 38 (2013). To constitute an accord and satisfaction, there must be (1) a bona fide dispute between the parties, (2) substitute performance tendered in full satisfaction of the claim, and (3) acceptance of the tendered performance. *Zornes v. Zornes*, 292 Neb. 271, 872 N.W.2d 571 (2015).

The principle questions in determining whether a discharge by accord and satisfaction has taken place include whether the parties in fact agreed that the performance rendered should operate as a final discharge and satisfaction and whether that performance constitutes a sufficient consideration for a return promise or for a discharge. *McCaulley v. Nebraska Furniture Mart, supra*. The question of whether a payment rendered by the obligor, and later asserted to be in satisfaction, was so tendered to the claimant that he knew or should have known that it was tendered in full satisfaction is a question of fact. *Id.* See, *Lone Cedar Ranches v. Jandebeur*, 246 Neb. 769, 523 N.W.2d 364 (1994) (key element of accord and satisfaction is intent of parties, which, although as general rule presents question of fact, becomes question of law when evidence creates no conflict as to intent).

Where the terms of an accord are uncertain, there can be no meeting of the minds and, therefore, no accord and satisfaction. *Peterson v. Kellner*, 245 Neb. 515, 513 N.W.2d 517 (1994), *disapproved on other grounds, Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019).

MRE challenges the district court's findings regarding the existence of an accord and satisfaction. MRE argues that while Saldana may have believed that $22,775.22 operated as a final payment to MRE, MRE did not have the same view. MRE further argues that its failure to reject the wire transfer of that amount is not evidence of acceptance of the tendered performance as full satisfaction of the claim, and the amount tendered is not sufficient consideration for discharge. MRE also cites evidence about the grain removal by Andersons and Wilson's calculations, and references testimony by Thelan about a discrepancy in production values which she noted in an email sent internally to employees of MRE in July 2011. MRE then simply argues that the district court erred in finding that the defense of accord and satisfaction barred any of MRE's claims. Andersons' position is that an accord and satisfaction was made on April 24, 2012 when Andersons paid the $22,775.22 as a final close-out for the tolling agreement, which amount was accepted and retained by MRE.

In addressing MRE's claim for credit for the ethanol purchased by B4, the district court observed that while the primary issue in MRE's breach of contract claim was the "cost of corn," MRE's complaint did include an allegation that Andersons failed to provide a true and correct accounting and thus the pleadings were sufficient to raise the issue of the claim for this credit. The court reviewed the evidence about the final "true up" at the end of the parties' relationship. It determined that the parties knew there would have to be a final accounting at the end of their relationship and that Thelen understood the final true-up spreadsheet as the final reconciliation.

- 15 -

The court also noted Saldana's testimony to her belief that the supporting documentation for the final wire payment sent to MRE said "final payment" on it. The court then found that while MRE did not specifically agree to the substance of the final reconciliation spreadsheet, it accepted the payment and failed to raise an objection prior to trial. The court found that even when accepting the testimony of Saldana (who would have added $52,846.50 to the final payment), Andersons had met its burden of proof regarding an accord and satisfaction and that MRE's claim for the credit with respect to the ethanol purchased by B4 was barred. It also found that Andersons' accord and satisfaction defense would also defeat any claim with respect to the corn removed from MRE's facility by Andersons.

The evidence with respect to the parties' intent and the sufficiency of the consideration was conflicting. In finding that Andersons met its burden of proof regarding an accord and satisfaction, the district court resolved those conflicts in Andersons' favor. The court's factual findings with respect to whether the April 24, 2014, wire transfer acted as a final discharge and satisfaction of B4's and MRE's obligations under the agreements are not clearly erroneous. The district court did not abuse its discretion in finding that the doctrine of accord and satisfaction discharged MRE's claim for credit for the ethanol purchased by B4 from MRE and in denying the motion for new trial or, in the alternative, to alter or amend the judgment on that basis. Likewise, it did not abuse its discretion in finding that the doctrine of accord and satisfaction discharged MRE's claim for credit for corn removed by Andersons.

### 4. SOL Applicable to MRE's Claims Against B4

MRE asserts that the district court erred in finding that its claims against B4 are barred by the SOL. Given our determination above that the court did not err in finding that MRE failed to prove an essential term of the processing and tolling agreements, we need not address this assigned error further. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *In re Trust Created by McGregor*, 308 Neb. 405, 954 N.W.2d 612 (2021).

### 5. Insufficient Proof of Joint Venture

MRE asserts that the district court erred in finding no evidence of a joint venture. MRE argues that there was sufficient evidence to show that the parties were engaged in a joint venture and that B4 and Andersons, accordingly, owed MRE a fiduciary duty "to not self-deal and fully and appropriately account for the 'cost of corn.'" Brief for appellant at 45. MRE argues that rather than not having equal voices in the alleged joint venture, as determined by the court, the parties simply entrusted certain responsibilities to one another.

In both its summary judgment order and in the January 2020 judgment, the district court addressed the merits of whether the parties formed a joint venture in the context of the effect of a joint venture theory on any SOL defense by B4 to MRE's claims. Although it is not necessary for us to address the court's statute of limitations findings, because the court considered the merits and of the existence of a joint venture and because MRE has specifically assigned error in that regard, we briefly address those arguments here.

After reviewing the trial evidence, the district court concluded that there was insufficient evidence of a joint enterprise either between MRE and B4 or B4 and Andersons. The court noted the parties' responsibilities under the processing and tolling agreements, but it concluded that the parties had differing pecuniary interests. The court also noted that while ethanol was to be marketed with input from MRE, the parties did not have an equal right of control in light of provisions that B4 and then Andersons were to have "total control and responsibility for the sale of said ethanol and all terms of said sales including determination of the purchasers and establishing the price."

In its order ruling on MRE's motion for new trial or, in the alternative, to alter or amend the judgment, the district court again found insufficient evidence of a joint venture (applying a preponderance of the evidence standard rather than the clear and convincing standard applied in the January 2020 judgment).

A joint venture is in the nature of a partnership and exists when (1) two or more persons contribute cash, labor, or property to a common fund (2) with the intention of entering into some business or transaction (3) for the purpose of making a profit to be shared in proportion to the respective contributions and (4) each of the parties have an equal voice in the manner of its performance and control of the agencies used therein, though one may entrust performance to the other. *Kohout v. Bennett Constr.*, 296 Neb. 608, 894 N.W.2d 821 (2017). The moving party bears the burden to prove a joint venture or enterprise exists by clear and convincing evidence. *Id.* But see *In re Dissolution & Winding Up of KeyTronics*, 274 Neb. 936, 744 N.W.2d 425 (2008) (existence of partnership must be proved by preponderance of evidence). The relationship of joint venturers depends largely upon the intent of the alleged parties as manifested from the facts and circumstances involved in each particular case. *Kohout v. Bennett Constr., supra*. A joint venture can exist only by voluntary agreement of the parties and cannot arise by operation of law. *Id.* Even a close relationship between two parties does not create an implied joint venture. *Id.*

The district court found insufficient evidence of a joint enterprise between any of the parties. It reviewed the details of the processing and the tolling agreements and found nothing to show that the parties had an equal right to a voice in the direction of the enterprise or an equal right to control under the agreements. We agree that, under either the clear and convincing burden or the preponderance of the evidence burden, MRE failed to prove the existence of a joint venture between the parties.

## VI. CONCLUSION

For the reasons set forth above, we affirm.

AFFIRMED.